No. 47,773

PAUL O. RAWLINS, *Appellant*, v. THE HUTCHINSON PUBLISHING COMPANY, a corporation, *Appellee*.

(543 P. 2d 988)

Opinion filed December 13, 1975.

*John A. Robinson*, of Rauh, Thorne and Robinson, of Hutchinson, argued the cause and was on the brief for the appellant.

*W. Y. Chalfant*, of Branine, Chalfant and Hyter, of Hutchinson, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

FOTH, C.: Paul O. Rawlins brought this action against the Hutchinson Publishing Company, publisher of the daily newspaper *The Hutchinson News*, for damages for the alleged invasion of his privacy. The trial court granted summary judgment in favor of the defendant newspaper, and plaintiff has appealed.

The newspaper carries a regular column "Looking Backward" which recalls and reports news items prominent on the corresponding date 10, 25 and 50 years ago. On April 4, 1974, the column carried the following statement:

"Ten years ago in 1964. Paul Rawlins, Hutchinson policeman, was indefi-

nitely suspended for conduct unbecoming an officer by Chief Carl Spriggs for allegedly annoying a woman. He denied the charge."

Six days later, on April 10, 1974, the column carried a further blurb:

"Ten years ago in 1964. Ray Bruggeman, City Manager, fired a policeman after he had been suspended a week by Chief Carl Spriggs after a complaint by a woman."

Plaintiff alleged that during the ten years since the events of April, 1964, he had led a purely private life and enjoyed a good reputation in the community; the 1964 incident was a forgotten relic of the past. The 1974 stories, he said, were "unwarranted invasions of the plaintiff's right to privacy, the right to be let alone, the right to be free from unwarranted publicity and the right to live without unwarranted interference by the public in matters in which the public is not necessarily or legitimately concerned, and the right to be free from unwarranted appropriation or exploitation of plaintiff's personality, private affairs, and private activities." The result of the publications, he alleged, was embarrassment, public ridicule and mental suffering for both him and his family.

In answer to a pre-trial request for admissions plaintiff admitted that the 1974 stories, although incomplete, "fairly summarized" portions of stories run in 1964. He also admitted that the 1964 stories attached to the request "fairly report the charges against the Plaintiff in April of 1964 and the action taken by Plaintiff's superiors at that time."

It appears that plaintiff's problems were of considerable public interest in 1964. The first story, dealing with his suspension from duty, appeared on the newspaper's front page with a four column headline, accompanied by a picture of plaintiff in uniform. It recited the charges of misconduct while on duty, and that plaintiff denied the charges. It also recited: "Rawlins asked that news media be brought in 'so they know what's going on.' "

The second 1964 story, covering his discharge a week later, was also front page news. It carried a three column headline, and repeated the charges of misconduct while on duty and plaintiff's denials.

In rendering summary judgment for the defendant the trial court entered the following findings and conclusions:

"5. That at all times material to the articles appearing in Defendant's newspaper on April 4, 1964, and April 10, 1964, Plaintiff was a uniformed policeman and member of the Hutchinson Police Department; that the articles

so published in 1964 accurately reported the charges placed against Plaintiff and the action taken by his superiors in first suspending and then discharging him from his position on the police force; and that by virtue of his involvement with serious disciplinary charges and the findings made by his superiors, Plaintiff became a figure of local history and the center of a local controversy of public interest at that time.

"6. That as a uniformed officer of the Hutchinson Police Department, charged with the duty and responsibility of protecting the safety and property of the public, Plaintiff was a public and not a private person.

"7. That the publication of reports concerning the charges, suspension and discipline of Plaintiff, as a police officer, involved public, not the private affairs of Plaintiff.

"8. That the public has a continuing interest in and right to review past events of local, regional or national concern for their historical, educational, informative or entertainment value.

"9. That Defendant was privileged to publish the historical summaries of fact contained in the issues of its newspaper on April 4, 1974, and April 10, 1974, and such publication was not an unwarranted publication, and involved public affairs."

On appeal plaintiff designates nine separate points, but as we see it they raise two controlling questions. First, were the facts which were published about him "public facts" and not "private facts" as found by the trial court? Second, what was the effect of the ten year period which elapsed between the occurrences of 1964 and the publications of 1974?

The questions arise because of our analysis of the four torts known collectively as "invasions of privacy" found in *Froelich v. Adair*, 213 Kan. 357, 516 P. 2d 993; and in *Dotson v. McLaughlin*, 216 Kan. 201, 531 P. 2d 1. In those cases we discussed the development of the right of privacy in this jurisdiction and elsewhere, and adopted the analysis found in Prosser, Law of Torts (4th Ed.), *Privacy*, § 117, and reformulated in the Restatement of the Law, Second, Torts (Tentative Draft No. 13) §§ 652A-652E:

"§ 652A. MEANING OF INVASION OF PRIVACY

"THE RIGHT OF PRIVACY IS INVADED WHEN THERE IS

"(a) UNREASONABLE INTRUSION UPON THE SECLUSION OF ANOTHER, AS STATED IN 652B; OR

"(b) APPROPRIATION OF THE OTHER'S NAME OR LIKENESS, AS STATED IN § 652C; OR

"(c) UNREASONABLE PUBLICITY GIVEN TO THE OTHER'S PRIVATE LIFE, AS STATED IN § 652D; OR

"(d) PUBLICITY WHICH UNREASONABLY PLACES THE OTHER IN A FALSE LIGHT BEFORE THE PUBLIC, AS STATED IN § 652E." (P. 101.)

"§ 652B. INTRUSION UPON SECLUSION

"One who intentionally intrudes, physically or otherwise, upon the solitude

or seclusion of another, or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable man." (P. 103.)

"§ 652C. APPROPRIATION OF NAME OR LIKENESS

"One who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy." (P. 108.)

"§ 652D. PUBLICITY GIVEN TO PRIVATE LIFE

"One who gives publicity to matters concerning the private life of another, of a kind highly offensive to a reasonable man, is subject to liability to the other for invasion of his privacy." (P. 113.)

"§ 652E. PUBLICITY PLACING PERSON IN FALSE LIGHT

"One who gives to another publicity which places him before the public in a false light of a kind highly offensive to a reasonable man, is subject to liability to the other for invasion of his privacy." (P. 120.)

Kansas was among the first states to recognize an action for invasion of privacy, in *Kunz v. Allen,* 102 Kan. 883, 172 Pac. 532 (1918). That was a case of "appropriation of name or likeness" and would be classified today under the Restatement's § 652C. Since then we have recognized causes of action for "intrusion upon seclusion" (§ 652B) in *Froelich v. Adair,* supra, and *Dotson v. McLaughlin,* supra; for "appropriation of name or likeness" (§ 652C) in *Johnson v. Boeing Airplane Co.,* 175 Kan. 275, 262 P. 2d 808; and for "publicity given to private life" (§ 652D) in *Munsell v. Ideal Food Stores,* 208 Kan. 909, 494 P. 2d 1063. (So far, it seems, all our cases which might have been categorized as "publicity placing person in false light" under § 652E have been cast by the parties in the more traditional molds of libel or slander.)

In categorizing the allegations here, giving due attention to the Restatement's notes, comments and illustrations, we must conclude that, if anything, they allege an invasion of privacy under § 652D, as giving "unreasonable publicity" to plaintiff's "private life." There was no "intrusion upon seclusion"—there is no claim that the newspaper ever came near plaintiff's person. There was no "appropriation" of plaintiff's name or person—the usual form of that tort is the unauthorized use of plaintiff's name or likeness for advertising or commercial purposes, or for some other benefit for which defendant ought to pay. And there is no claim here that plaintiff was put in a "false light"—the stories are admitted to be accurate.

We must determine, then, whether what was publicized concerned the "private life" of the plaintiff. We think it clear it did not. In 1964 plaintiff was a police officer, charged with the duties of that office. He was a public official, in whose conduct the public has a vital interest. His contention that his rank did not elevate

to the status of a "public official" cannot be sustained. In a libel action brought by a patrolman against a newspaper, the Illinois Supreme Court answered such a contention in convincing language:

"It is our opinion that the plaintiff is within the 'public official' classification. Although as a patrolman he is 'the lowest in rank of police officials' and would have slight voice in setting departmental policies, his duties are peculiarly 'governmental' in character and highly charged with the public interest. It is indisputable that law enforcement is a primary function of local government and that the public has a far greater interest in the qualifications and conduct of law enforcement officers, even at, and perhaps especially at, an 'on the street' level than in the qualifications and conduct of other comparably low-ranking government employees performing more proprietary functions. The abuse of a patrolman's office can have great potentiality for social harm; hence, public discussion and public criticism directed towards the performance of that office cannot constitutionally be inhibited by threat of prosecution under State libel laws." (*Coursey v. Greater Niles Twp. Pub. Corp.,* 40 Ill. 2d 257, 264-5, 239 N. E. 2d 837.)

The term "public official" has been held to embrace a patrolman (*Moriarty v. Lippe,* 162 Conn. 371, 294 A. 2d 326), a deputy sheriff (*St. Amant v. Thompson,* 390 U. S. 727, 20 L. Ed. 2d 262, 88 S. Ct. 1323), a deputy chief of detectives (*Time, Inc. v. Pape,* 401 U. S. 279, 28 L. Ed. 2d 45, 91 S. Ct. 633), a police chief (*Henry v. Collins,* 380 U. S. 356, 13 L. Ed. 2d 892, 85 S. Ct. 992), and three policemen (*Hull v. Curtis Publishing Company,* 182 Pa. Super. 86, 125 A. 2d 644). Indeed, it has been held presumptively to include a supervisor of a county recreation area (*Rosenblatt v. Baer,* 383 U. S. 75, 15 L. Ed. 2d 597, 86 S. Ct. 669).

All the foregoing were libel cases (except *Hull,* a right to privacy case). In them the "public official" label was important in determining the necessity of showing "actual malice" in publishing the libel, under the doctrine of *New York Times Co. v. Sullivan,* 376 U. S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710, 95 A. L. R. 2d 1412. The doctrine is based on the proposition that debate on public issues "may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." (*Id.,* p. 270.) The Court there quoted Justice Frankfurter's observation that "public men, are, as it were, public property." (*Id.,* p. 268; *Beauharnais v. Illinois,* 343 U. S. 250, 96 L. Ed. 919, 72 S. Ct. 725, Note 18.) The *New York Times* rule was extended to those who are merely "public figures" in *Curtis Publishing Co. v. Butts,* 388 U. S. 130, 18 L. Ed. 2d 1094, 87 S. Ct. 1975.

Persons who are not "public officials" (or at least "public figures")

are subject to greater protection from defamatory falsehood. That is, the publisher may be required to respond in damages for defaming a "private person" even though the publication was made with some degree of culpability less than the actual malice required by *New York Times.* See *Gertz v. Robert Welch, Inc.,* 418 U. S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997; *Gobin v. Globe Publishing Co.,* 216 Kan. 223, 531 P. 2d 76.

Although these principles were established in the field of defamation law, they have a direct bearing on the closely related field of privacy we are dealing with here. We have held:

> "Only unwarranted invasions of the right of privacy are actionable. The right of privacy does not prohibit the communication of any matter though of a private nature, when the publication is made under circumstances which would render it a privileged communication according to the law of libel and slander." (*Munsell v. Ideal Food Stores,* supra, Syl. ¶ 4.)

That is to say, if the circumstances are such that there is a qualified privilege to communicate even defamatory falsehoods about an individual, so long as it is done without actual malice, there is an absolute privilege to communicate matters which are true.

As to "public officials" or "public figures," quite apart from the First Amendment considerations delineated in *New York Times* and *Butts,* it is generally held that those who voluntarily step upon the public stage thereby forego their right of privacy, at least as to their conduct in their public roles. "A person who by his accomplishments, fame, or mode of life, or by adopting a profession or calling which gives the public a legitimate interest in his doings, affairs, or character, is said to become a public personage, and thereby relinquishes a part of his right of privacy. (*Metter v. Los Angeles Examiner,* 35 Cal. App. 2d 304, 312 [95 P. 2d 491]; *Sidis v. F-R Pub. Corp.,* (Circuit Court of Appeals, Second Circuit) 113 F. 2d 806, 809.)" (*Cohen v. Marx,* 94 C. A. 2d 704, 705, 211 P. 2d 320.)

The principle is recognized by the Restatement in its comment c. to § 652F (to be transferred under Tentative Draft No. 21 to § 652D):

> "One who voluntarily places himself in the public eye, by engaging in public activities, or by submitting himself or his work for public judgment, cannot complain when he is given publicity which he has sought, even though it may be unfavorable to him. So far as his public appearances and activities themselves are concerned, such an individual has, properly speaking, no right of privacy, since these are no longer his private affairs." (P. 128.)

See, e. g., Bell v. Courier-Journal and Louisville Times Company, 402 S. W. 2d 84 (Ky. Ct. App. 1966); Samuel v. Curtis Pub. Co., 122 F. Supp. 327 (N. D. Calif. 1954); Metter v. Los Angeles Examiner, supra.

If a public figure foregoes his right of privacy as to his "public appearances and activities," a public official, a fortiori, has no right of privacy as to the manner in which he conducts himself in office. Such facts are "public facts" and not "private facts." Hence, a truthful account of charges of misconduct in office cannot form the basis of an action for invasion of privacy.

What has been said would dispose of this case were it not for plaintiff's claim that the lapse of time since he was a public official operated to restore his right of privacy. In support he cites Melvin v. Reid, 112 Cal. App. 285, 297 Pac. 91 and Briscoe v. Reader's Digest Association, Inc., 4 C. 3d 529, 93 Cal. Rptr. 866, 483 P. 2d 34. In Melvin the defendants made a motion picture of the early life of the plaintiff, who had been acquitted in a notorious murder case. It truthfully depicted her as a prostitute at that time, and used her true maiden name; all facts were drawn from the public record. When the picture was made she had long since abandoned her previous calling and assumed a place in respectable society. The court held that while the facts of her prior life were not private, the use of her name was actionable. Similarly, in Briscoe the plaintiff had hijacked a truck and "had paid his debt to society." Some 11 years later the defendant used his name and an account of his crime in a story about the "business" of hijacking. In each case there was a balancing by the court of the First Amendment rights of the press and public on the one hand, against the right of privacy and society's interest in the rehabilitation of former wrongdoers on the other. The balance was struck in favor of the latter.

There is, however, considerable contrary authority, among which is the leading case of Sidis v. F-R Pub. Corporation, 113 F. 2d 806 (2d Cir. 1940). The plaintiff there had been a famous child prodigy in 1910. He had lectured to distinguished mathematicians at age 11, and had been graduated from Harvard at age 16, all to the accompaniment of considerable publicity. Thereafter he sought obscurity and went to great lengths to achieve it. In 1937 The New Yorker magazine, in a department called "Where Are They Now", recalled his early days of fame, recounted his subsequent attempts to conceal his identity, and described his current mode of living. As characterized by the court, "the article is merciless in its dissec-

tion of intimate details of its subject's personal life, and this in company with elaborate accounts of Sidis' passion for privacy and the pitiable lengths to which he has gone in order to avoid public scrutiny. The work possesses great reader interest, for it is both amusing and instructive; but it may be fairly described as a ruthless exposure of a once public character, who has since sought and has now been deprived of the seclusion of private life." (Pp. 807-8.)

The court nevertheless found no actionable invasion of his privacy. By his earlier achievements he had made himself a legitimate object of continuing public interest, and therefore "newsworthy." The court there observed, "Regrettably or not, the misfortunes and frailties of neighbors and 'public figures' are subjects of considerable interest and discussion to the rest of the population. And when such are the mores of the community, it would be unwise for a court to bar their expression in the newspapers, books, and magazines of the day." (P. 809.)

Likewise in *Cohen v. Marx*, supra, the plaintiff "Canvasback Cohen" had been retired from the prize ring for ten years when Groucho Marx referred to him by that name on the air. The plaintiff doubtless preferred that his former sobriquet remain forgotten. The court held, however, that he had no cause of action for invasion of privacy, saying, "it is evident that when plaintiff sought publicity and the adulation of the public, he relinquished his right to privacy on matters pertaining to his professional activity, and he could not at his will and whim draw himself like a snail into his shell and hold others liable for commenting upon the acts which had taken place when he had voluntarily exposed himself to the public eye. As to such acts he had waived his right of privacy and he could not at some subsequent period rescind his waiver." (*Id.*, 94 C. A. 2d at 705.)

In *Werner v. Times-Mirror Co.*, 193 C. A. 2d 111, 14 Cal. Rptr. 208, the plaintiff claimed an invasion of privacy by a 1958 newspaper story about his impending marriage. The story recalled his tenure as city attorney almost thirty years before, and referred to the fact that he and his first wife "were rocked by a municipal scandal in the late 1930s". The story stated that his first wife had served a sentence for grand theft, while he had been disbarred and later reinstated as being rehabilitated. The court held that he had no cause of action. Plaintiff had been a "public personage" and had thereby relinquished his right of privacy as to the reported

matters, which were of legitimate public concern. The court went on to say:

"Mere passage of time does not preclude publication of incidents of public interest from the life of one formerly in the public eye which are already public property, and such incidents, being imbedded in communal history, are proper material for recounting in the literature, journalism or other media of communication of a later day." (Syl. ¶ 11.)

The *Werner* court quoted with approval Dean Prosser's statement in *Privacy*, 48 Cal. L. Rev. 383, 418:

". . . There can be no doubt that one quite legitimate function of the press is that of educating or reminding the public as to past history, and that the recall of former public figures, the revival of past events that once were news, can properly be a matter of present public interest. . . . Such decisions indicate that once a man has become a public figure, or news, he remains a matter of legitimate recall to the public mind to the end of his days."

The same result was reached in *Smith v. National Broadcasting Co.*, 138 C. A. 2d 807, 292 P. 2d 600. Plaintiff had made a report, later found to be false, of a black panther being loose in the city of Los Angeles. The report was widely publicized and created considerable community apprehension at the time. Some three months later, long after the initial commotion had died down, the incident was dramatized and reenacted on the radio program "Dragnet." Although his name was not used, plaintiff sued for an invasion of his privacy.

The court first found that "plaintiff's complaint is fatally deficient in its failure to allege facts showing an infringement on any part of his *private* life or personality." (P. 811. Emphasis the court's.) As to his contention that the events were no longer newsworthy because of the passage of time, the court said:

". . . It is a characteristic of every era, no less than of our contemporary world, that events which have caught the popular imagination or incidents which have aroused the public interest, have been frequently revivified long after their occurrence in the literature, journalism, or other media of communication of a later day. These events, being embedded in the communal history, are proper material for such recounting. It is well established, therefore, that the mere passage of time does not preclude the publication of such incidents from the life of one formerly in the public eye which are already public property. [Citations omitted.]" (P. 814.)

Apart from the persuasiveness of these and similar cases (see Anno., *Waiver or Loss of Right of Privacy*, 57 A. L. R. 3d 16, §§ 32-34), we think much of the force of *Melvin* and *Briscoe* is overcome by the latest pronouncement of the United States Supreme Court in

*Cox Broadcasting Corp. v. Cohn,* 420 U. S. 469, 43 L. Ed. 2d 328, 95 S. Ct. 1029. That was an action for invasion of privacy based on the defendant's publication of the name of a deceased rape victim who was plaintiff's daughter. A Georgia statute prohibited the publication of the name or identity of a rape victim, although the name could be obtained from the court records. The Georgia Supreme Court had found a cause of action, based in part on the balancing test of *Briscoe.*

The Supreme Court reversed, holding the Georgia statute to conflict with the freedom of the press guaranteed by the First Amendment. The court noted that "[g]reat responsibility is . . . placed upon the news media to report fully and accurately the proceedings of government. . . ." ( 420 U. S. at 491-92.) The basis for the Court's holding was:

". . . Public records by their very nature are of interest to those concerned with the administration of government, and a public benefit is performed by the reporting of the true contents of the records by the media. The freedom of the press to publish that information appears to us to be of critical importance to our type of government in which the citizenry is the final judge of the proper conduct of public business. In preserving that form of government the First and Fourteenth Amendments command nothing less than that the States may not impose sanctions on the publication of truthful information contained in official court records open to public inspection." ( 420 U. S. at 495.)

*Cox,* as we read it, would surely dictate a different result in both *Melvin* and *Briscoe.* In both of those cases the name of the plaintiff, like the name of the victim in *Cox,* could be found in the public records. Under *Cox* names, like facts, are in the public domain when available in public records. Liability for publishing the names would be, as we see it, prohibited by the First and Fourteenth Amendments.

*Cox, Sidis, Cohen, Werner, Smith* and the like strike us as more sound than *Melvin* or *Briscoe.* The purpose of the tort is to protect an individual against unwarranted publication of *private* facts. Once facts become public the right of privacy ceases. We do not see how public facts, once fully exposed to the public view, can ever become private again. We cannot conceive, for example, that any of the participants in the recent "Watergate" scandal can ever acquire a cause of action for invasion of privacy based on a retelling of that story. We cannot make any significant distinction between a president and the myriad of lesser public officials whose scandals may make news, differing only in the size of the body politic they

serve. In either case official misconduct is newsworthy when it occurs, and remains so for so long as anyone thinks it worth retelling. We therefore reject the test of "current newsworthiness," requiring a case by case evaluation of the current public interest, at least where the facts published are public facts concerning one who is or was a public official. Such a test would impose an intolerable burden on the press to publish at the peril of having its news judgment later declared faulty in an action for damages. The "chilling effect" such a rule would have is apparent.

In this case plaintiff while a policeman was a public official. His troubles in 1964 dealt with his conduct in office, and not with his private life. The facts were at that time a matter of public concern, and were public facts   We deem it of no significance that he apparently invited the publicity they received by calling in the news media—the press was privileged to make truthful reports of allegations of misconduct in office without being invited to do so. Once these facts entered the public domain they remained there. His waiver of the right of privacy as to public facts could not be withdrawn—plaintiff could not "draw himself like a snail into his shell." (*Cohen v. Marx,* supra.)

One may well sympathize with plaintiff's plight; every man has episodes in his life he would prefer to remain forgotten. The action of the defendant newspaper in dredging up this episode may seem ill-advised and in poor taste, but that does not make it actionable. "A responsible press is an undoubtedly desirable goal, but press responsibility is not mandated by the Constitution and like many other virtues it cannot be legislated." (*Miami Herald Publishing Co. v. Tornillo,* 418 U. S. 241, 256, 41 L. Ed. 2d 730, 740, 94 S. Ct. 2831.) Neither can it be wrought through an award of damages.

We hold that on the undisputed facts there was no invasion of plaintiff's privacy and the trial court therefore correctly rendered summary judgment for the defendant.

Affirmed.

APPROVED BY THE COURT.