443 So.2d 817 (1983)
Charles NEWSON
v.
Aaron E. HENRY and Ruth Armstrong Ross, Executrix of the Estate of L.A. Ross, Jr., Deceased.
No. 54205.
Supreme Court of Mississippi.
November 23, 1983.
Rehearing Denied January 25, 1984.
*819 Cleve McDowell, Cleveland, for appellant.
W.O. Luckett, Jr., W. Kurt Henke, Luckett, Luckett, Luckett & Thompson, Clarksdale, for appellees.
En Banc.
PRATHER, Justice, for the Court:
Aaron E. Henry and L.A. Ross, Jr.[1] filed defamation suits in the Circuit Court of Coahoma County based upon a newspaper article written by Wilson F. Minor and published in the Capital Reporter Newspaper. The article quoted comments about Henry and Ross made by Charles Newson. Newson, Minor, and the newspaper were all made defendants; however, upon pleas of improper venue jurisdiction, the actions against Minor and the newspaper were abated in Coahoma County for transfer to Hinds County.
A jury verdict in the amount of $2,500.00 for punitive damages only was returned against Newson for libelous conduct in each case, but no actual damages were awarded. From judgment, both parties appeal.
Newson, appellant, asserts that the judgment cannot avail because (1) the slanderous statements were not published in Coahoma County; (2) because malice of Newson was not proven against the plaintiffs who are public figures; and, (3) because punitive damages cannot be supported without an award of actual damages.
The plaintiffs cross-appeal assigning as error the trial court's refusal to grant a new trial as to actual damages only, or in the alternative, an additur.

I.
Dr. Aaron E. Henry is a black businessman, and a pharmacist, of Clarksdale.[2] He was former co-chairman of the State Democratic Executive Committee and on the National Board of Directors and Mississippi president of the National Association for the Advancement of Colored People. Henry has been and is politically active in support of, or opposition to, political issues, organizations, and candidates for public office. In 1979, Dr. Henry was himself elected to the Mississippi State Legislature. In his testimony Dr. Henry admitted that he is a public figure.
L.A. Ross, Jr. is a 74 year old retired farmer of Coahoma County who served as sheriff of that county for one term, from 1960 through 1963. In 1967, Ross ran an unsuccessful campaign for reelection for sheriff; however, upon defeat, he left political life totally. Since 1967, Ross has farmed to some extent, but upon amputation *820 of his leg, and confinement to a wheel chair, Ross' activities have been basically confined to his wood-working shop at his home. In his two campaigns for sheriff, Ross had the support of Dr. Henry.
Another personality in this lawsuit is Charles Newson, a Clarksdale auto parts dealer. Newson was a participant with Henry in political activities since 1965. Henry was instrumental in securing federal funding for Coahoma Opportunities, Inc., (C.O.I.), and in Newson's becoming employed there. While so employed, Newson sought Henry's advice about seeking political office; Henry advised Newson that such activity was prohibited by the Hatch Act while he was employed by the federal government.
Upon announcement of Newson's seeking a political office, the Directors of C.O.I. offered Newson the opportunity of resigning from his job or withdrawing from the race. Newson declined to do either, and he was fired. Subsequently, Newson asked Henry to assist him with the Directors in securing reemployment; Henry declined stating that he had personally advised him otherwise prior to the firing. Newson's reaction was described as being "very angry." The record does not reflect the time of this occurrence, except that it preceded the newspaper article involved in this lawsuit.
Prior to June 19, 1980, Charles Newson read an article in the Capital Reporter attributing critical remarks to Dr. Henry about Charles Evers.[3] Upon reading that article, Charles Newson telephoned Wilson (Bill) F. Minor, the newspaper reporter at the Capital Reporter, and made representation to him that Dr. Henry accepted $3,500.00 to "deliver the black vote in Coahoma County" to L.A. Ross, a candidate for sheriff in 1968.[4]
Newson testified that Minor was to show him the proposed article before printing. The stated amount and the date were erroneous. However, he admitted that the article otherwise was written substantially as he represented to Minor. The entire text of the article appears in Appendix A to this opinion.
Minor did not know Newson prior to this phone call. He attempted to contact Henry once to discuss the alleged improper activity, but was unable to do so. Moreover, he did not attempt to locate Ross at all in order to confirm the story, nor did he use any other means of investigation to verify it before publication on June 19, 1980.
Henry and Ross sought retraction from Minor and Newson, but their efforts failed. After publication, Newson allegedly made such comments as: "I've got him now" and "I tore him up."
During trial, there was testimony which indicated that Newson's motive in divulging the story to Minor was to harm Henry because of Henry's failure to aid in Newson's reemployment with C.O.I.

II.
The appellant first contends that the alleged slanderous statements were not published in Coahoma County, and that this was an element of the plaintiff's substantive cause of action.
Newson claims that publication to a third party in Coahoma County is necessary to be proven. Newson telephoned from Coahoma County to a third party, Minor, in Hinds County. Minor wrote the spoken words and published them in Jackson. The newspaper was circulated over a wide area, including Coahoma and Hinds Counties via the Capital Reporter.
However, Henry and Ross did not have to prove publication in any particular county in order to recover on the merits of their claim. They did have to prove that the first publication occurred in Coahoma County in order to fix venue in Coahoma County.
*821 The applicable rule is that the author of the defamation is liable for any secondary publication which is the natural consequence of the author's original action. 53 C.J.S. Libel and Slander § 85 (1948).
Newson was well aware of the proposed publication and was to have approved the content. He knew the natural consequence of his telephone call to the reporter and expected the republication of his words. We find no merit to this argument.

IIIA.
The plaintiffs' failure to meet their burden of proof in establishing malice in this defamation suit is the next assignment of error.
Our Mississippi constitution guarantees to every citizen freedom of speech and of the press as "sacred rights." Miss. Const. art. III, § 13. However, this right has been counterbalanced with the principle that individuals should "enjoy their reputations unimpaired by false and defamatory attack." 50 Am.Jur.2d 512, Libel and Slander, § 1 (1970). For damage to one's reputation, defamation suits provide redress as a limitation, to freedom of speech and of the press. But proof of malice is an element necessary to recover damages; however, there are exceptions in suits that are actionable per se.
However, a paramount public policy has developed in cases where comment against a public figure is involved. Our Court has adopted the standard for proof of malice as set forth in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). In the case of a public figure, the burden of proof of malice by clear and convincing evidence is on the plaintiff. Reaves v. Foster, 200 So.2d 453 (Miss. 1967), Gulf Publishing Co., Inc. and David Bean v. Webb Lee and Tommy Gollott, 434 So.2d 687 (Miss. 1983).
The burden of proof which a public figure must prove to recover for a defamatory remark is that the statement was (1) made with knowledge that it was false, or (2) made with reckless disregard of whether it was false or not. Gulf Publishing Co., Inc., supra. The inquiry into malice focuses upon the state of mind at the time of publication of the person speaking or printing the statement.
Initially, we observe that the burden of proof of malice required of a public official or figure, who is subject to the fair comment doctrine, (Edmonds v. Delta Democrat Publishing Company, 230 Miss. 583, 93 So.2d 171 [1957]) is different from a person not a public figure. Therefore, we consider the status of these two plaintiffs involved in this controversy at the outset for the purpose of determining their burden of proof in establishing malice.
Admittedly, Dr. Aaron E. Henry is a public figure and public official, as he so testified. No challenge is made of this conclusion. The status of L.A. Ross, Jr. is not so clear. He was a former public officer as sheriff from 1960 to 1963 and a public figure in his unsuccessful campaign for sheriff in 1967. Ross had been retired from public life for thirteen years when the article was published in 1980.
The question then arises whether, after the passage of time and his withdrawal from public life and controversies, Ross lost his public figure status and is not required to meet the actual malice standard of New York Times Co., Inc. v. Sullivan, supra.
We have held that one holding a "prominent position public or quasi-public in nature" is covered under the fair comment doctrine. Reaves, supra. We find no precedent within our jurisprudence showing when those attributes may be abandoned, although other jurisdictions have addressed the question.
In Wolston v. Reader's Digest Association, Inc., 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979), the Supreme Court held that the plaintiff was not a public figure and was not required to meet the actual malice standard of New York Times Co. v. Sullivan. Although the majority opinion did not mention the lapse of time question, *822 the concurring opinion written by Justice Blackmun with whom Justice Marshall joined, agreed with the result on the basis that the "lapse of the intervening sixteen years renders consideration of this petitioner's original public figure status unnecessary... ." Id. at 170, 99 S.Ct. 2708.
The majority in Wolston reaffirmed that there are two ways persons might be a public figure for purposes of the "actual malice" standard of Times v. Sullivan: (1) by occupying positions of such persuasive power and influence that they are deemed public figures for all purposes, and (2) more commonly, those that have thrust themselves to the forefront of a particular public controversy in order to influence the resolution of the issues involved. See Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).
In Rosenblatt v. Baer, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966), the Supreme Court did not address the passage of time issue; however, in a footnote the Court acknowledged, "There may be cases where a person is so far removed from a former position of authority that comment on the manner in which he performed his responsibilities no longer has the interest necessary to justify the New York Times rule." Id. at 88, 86 S.Ct. at 677, 15 L.Ed.2d 606, n. [15] 14.
An entertainer who had retired from that vocation for eight years while she became a companion of another entertainer, Elvis Presley, was still considered a public figure by the Fifth Circuit Court of Appeals when her name continued to be connected with Presley. In Brewer v. Memphis Publishing Co., Inc., 626 F.2d 1238 (5th Cir.1980), the Court held:
It might be that during the "active" public figure period a wider ranger of articles, including those only peripherally related to the basis of the public figure's fame, are protected by the malice standard and that the passage of time or intentional retreat narrows the range of articles so protected to those directly related to the basis for fame. [Id. at 1257].
Of a similar holding, the Fourth Circuit Court of Appeals held that Neil Johnston had not changed from a public figure as a professional basketball player to a private person as a college basketball assistant coach. The publication referred to events occurring twelve years prior and nine years after he had retired from professional basketball.
Moreover, mere passage of time will not necessarily insulate from the application of New York Times Co. v. Sullivan, publications relating to the past public conduct of a then "public figure". No rule of repose exists to inhibit speech relating to the public career of a public figure so long as newsworthiness and public interest attach to events in such public career. [Time, Inc. v. Johnston, 448 F.2d 378 (4th Cir.1971)].
Specifically addressing the passage of time since an event occurred and a subsequent publication, courts have made a factual termination in each case. Fitzgerald v. Penthouse International, Ltd., 525 F. Supp. 585 (D.C.Md. 1981) (four years insufficient to erode public figure status).
Likewise, a person remains a public figure thereafter for purposes of later commentary or treatment of that controversy. Street v. National Broadcasting Co., 645 F.2d 1227 (6th Cir.1981). In the Street case, supra, a documentary revived the discussion of a rape trial that occurred forty years prior to the broadcast. The prosecutrix and main witness in a rape trial, even though she disappeared from public view for forty years, was held to still be subject to public discussion as a public figure.
Rawlins v. Hutchinson Publishing Co., 218 Kan. 295, 543 P.2d 988 (1975), is similar factually to the case under consideration. Rawlins, a police officer in 1964, was suspended and subsequently fired for conduct unbecoming a police officer in allegedly annoying a woman. In 1974 a republication of the reporting in a section called "Looking Backward" gave rise to an invasion of privacy, not libel, suit. Asserting that he had become a private citizen in the *823 intervening ten years, Rawlins sought damage. However, the Kansas Court held the facts were a matter of public concern and public facts. Once the facts had entered the public domain, they remained there.
The Street and Rawlins cases suggest the principle which guides us to decision. Once a person becomes a public figure, he or she remains a public figure with respect to the event or events that made him or her a public figure in the first place. He or she may in time become a private figure, but only with respect to the events of his or her life occurring after he or she leaves public life.
Thirteen years had passed since Ross last sought public office. For the latter years of his life, he no doubt was a private figure. A person who seeks elective office, however, is as a matter of law a public figure. See, e.g., Manasco v. Walley, 216 Miss. 614, 63 So.2d 91 (1953). Ross was clearly a public figure in 1967. The defamatory statements made by Newson referred to Ross' 1967 campaign for sheriff. Anything Ross did in connection with that campaign remains in the public domain and he remains a public figure when he brings suit for libel regarding the events of that campaign, even though the libel is not published until thirteen years later.
Accordingly, under the principles recited above and under the facts of this case Ross remained a public figure with respect to publications and commentary regarding his 1967 campaign for sheriff. This is so even though he no doubt became a private figure in the later years of his life. We therefore hold that in order to recover Ross was required to prove actual malice as defined above.

IIIB.
Did the plaintiffs meet their burden of proof of malice in this case by clear and convincing evidence? Our Court has discussed the actual malice element necessary to be proven to support a judgment. Factual error, defamatory of a public figure's reputation, was insufficient to warrant a damage award unless actual malice existed. As previously stated actual malice could only be shown by proof that the statement when made was (1) known to be false or (2) made in reckless disregard of whether true or false.
Cross-appellants here contend that the utterances were actionable per se and that a presumption of actual malice is raised, thus satisfying the New York Times test, supra. Travis v. W.H. Hunt, 224 Miss. 193, 79 So.2d 734 (1955). Ross and Henry assert that the statement here imputes a criminal offense of corrupt election practices and are therefore actionable per se. We believe the New York Times test applies. Reaves v. Foster, supra, Henry v. Collins (from this Court), 380 U.S. 356, 85 S.Ct. 992, 13 L.Ed.2d 892 (1965).
We address factually the events to determine malice. Clearly the facts developed anger, spite, ill will and hostility of Newson toward Henry because of Newson's loss of employment. An intention to harm Henry's reputation could be inferred from his remark that "I've got him now" and "I tore him up." Newson never testified that he saw any money transfer from Ross to Henry. Henry testified that Newson told him that the statements to Minor were made through anger for Henry's failure to help Newson get reemployed. At trial on this testimony, Henry was not cross-examined by defense counsel.
Newson's testimony on this point stated that he saw Henry with some money and "based on my knowledge, if my memory serves me right, I think maybe Dr. Henry might have said the money came from Ross, too. I'm not sure."
These facts evidence a reckless disregard for the truth sufficient to support proof of actual malice. We conclude that the plaintiff, Aaron Henry a present public figure and former public official, has met his burden of establishing malice under New York Times v. Sullivan, supra.
Ross, who is a public figure for purposes of this action, bases his claim on the same *824 facts. It thus follows that he has likewise met his burden of proof.

IV.
Can punitive damages be supported without a jury award of actual damages?
The jury returned an award of $- 0 - actual damages and $2,500.00 punitive damages. Appellant urges this Court to reverse contending that punitive damages fail where no award of actual damages were made. However, several decisions rendered by this Court suggest that the law is otherwise under certain exceptions. For example, the Court determined in Jefferson v. Bates, 152 Miss. 128, 118 So. 717 (1928), where the words spoken were deemed actionable per se pursuant to a statute, that the plaintiff was entitled to exemplary damages without proving special damages. To the same effect is the case of Wells v. Branscome, 222 Miss. 1, 74 So.2d 743 (1954). The general law is set forth in 50 Am.Jur.2d Libel and Slander § 352 (1970) as follows:
[W]here the defamation complained of is actionable per se, it is generally held that punitive damages may be awarded even though the amount of actual damages is neither found nor shown, for in such a case the requirement of a showing of actual damages as the basis of an award of exemplary damages is satisfied by the presumption of injury which arises from a showing of libel or slander that is actionable per se. But where the defamation is not actionable per se, punitive damages cannot be allowed unless either general or special damage is shown.
The rationale of this rule is based upon the principle that the defendant must have committed a tortious act before punitive damages can be assessed.
In Wrought Iron Range Co., et al. v. Boltz, 123 Miss. 550, 86 So. 354 (1920) we stated that:
[A]ny written or printed language which tends to injure one's reputation, and thereby expose him to public hatred, contempt, or ridicule, degrade him in society, lessen him in public esteem, or lower him in the confidence is actionable per se. ... Id. at 558, 86 So. at 355 (Emphasis added).
See also, Brewer v. Memphis Publishing Co., 626 F.2d 1238 (5th Cir.1980).
Both plaintiffs offered proof from community leaders and acquaintances of damages to support their claim. Since libel was found and malice was supported by the proof, it was not necessary to award actual damages as a prerequisite to awarding punitive damage in suits that are actionable per se. Wells v. Branscome, supra, 50 Am.Jur.2d, supra.
We, therefore, find no merit in this assignment.

V.
The cross-appellants here assert through their cross-appeal that the lower court erred in denying their motion for a new trial as to actual damages only, or in the alternative, an additur.
We deny the cross-appeal and hold that the failure of the jury to assess actual damages, whether through inadvertence, mistake, or mischance, constitutes an error of form rather than of substance.
We are disposed to liberally construe the verdict in this case as a general verdict covering all of the damages, both actual and punitive, rather than strictly as an erroneous verdict.
We affirm the trial court and deny both appeal and cross-appeal.
AFFIRMED.
PATTERSON, C.J., WALKER and BROOM, P. JJ., and ROY NOBLE LEE, BOWLING, HAWKINS, DAN M. LEE and ROBERTSON, JJ., concur.
HAWKINS, J., specially concurs.

APPENDIX "A"
Clarksdale businessman critical of Henry by Bill Minor
*825 A leading Clarksdale black businessman told the Capital Reporter that "no more than 10 percent of the blacks" are supporting Aaron Henry, the Clarksdale druggist and ousted Democratic co-chairman, in Henry's Democratic party challenge.
"I think Aaron needs to step aside and let some new leadership come in that can negotiate with both sides," said Charles Newsom, owner of a Clarksdale auto parts company and a land bonding business.
Newsom, who said that he had come forward as a critic of Henry "because nobody wants to challenge him and he needs to be challenged," charged that Henry now "is wearing too many hats and he needs to give up some of them."
The Clarksdale businessman contended that Henry "has been doing some of the same things he is accusing Charles Evers of doing ... selling his political influence." Took $3,500
Newsom said in one specific incident dating back to 1968, Henry accepted $3,500 to "deliver the black vote in Coahoma County" to L.A. Ross, a candidate for sheriff.
"When we found it out in the Young Democrats (in Coahoma County), we rebelled against it," said Newsom, and "Ross did not carry the election. But as far as I know, Aaron kept the money."
In Henry's battle over keeping the co-chairmanship in State Democratic Executive Committee, Newsom said, "If he (Henry) was dissatisfied with Danny Cupit being chairman, Aaron should have asked to be chairman not just co-chairman, and accept the results of the committee vote. I believe he just wants to fan the black-white issue."
Newsom said, "I think a good example of how much influence he has with the Democratic Party in Mississippi was in the U.S. Senate race two years ago, when he came out for Maurice Dantin, and Dantin got clobbered."
"In name only"
Henry, state president of the NAACP, has also been president of the Coahoma County chapter of the NAACP for years, said Newsom, "but he is president here in name only, because he is not functioning ... he is only using it so he can have a WATS line and not have to pay for his telephone bill."
Newsom described himself as a "self-made businessman, who doesn't take hand outs from the government or any place else."
His son, John Newsom, is president of the Correctional Officers Association at Parchman Penitentiary and is now about to receive his masters degree from Delta State University.
HAWKINS, Justice, Specially Concurring.
I concur in affirming.
In my view it is irrelevant, however, whether Henry or Ross were public or private figures, and the cases discussing this question have no application here.
Newson was not a newspaper reporter or publisher. He originated the tale. If it was false, which the jury found to be the case, the jury had abundant clear and convincing evidence to find it came from plain old undiluted malice.
NOTES
[1] Ruth Armstrong Ross, as Executrix of the Estate of L.A. Ross, Jr., Deceased, was substituted as appellee on February 9, 1983.
[2] Honorary doctorate degrees from three institutions were granted to Dr. Henry.
[3] Charles Evers is another state and national public figure who had been a political candidate.
[4] This testimony was apparently in error and should have been in 1967.