I INTRODUCTION
On October 2, 1996, the New Haven Register (Register) published on its front page an article entitled "Former NAACP treasurer rearrested." The article, written by David McClendon of the "Register Staff," began with the sentence: "William B. Jones, the former treasurer of the local NAACP convicted of stealing $ 14,000 from the organization's coffers last year, was arrested Tuesday for violating his parole." A box inserted in the article quoted the chapter president as saying, "Mr. Jones owes the NAACP some jail time." The text of the article was accurate. What was not accurate was a file photograph of "Jones" accompanying the article.
The photograph accompanying the article (the photograph as well as the article was on the front page) was indeed a photograph of a person named William B. Jones. The William B. Jones who was the subject of the photograph, however, was not the William B. Jones who had been arrested. The William B. Jones pictured in the Register was a different person of some local prominence who, as far as the record indicates, had led a blameless life. The Register, on its own initiative, ran a correction on the following day. Nevertheless, the photographed William B. Jones (as distinct from the arrested William B. Jones) has now sued the Register, McClendon, and certain other employees, for libel and *Page 636 
other torts arising out of the original publication. The Register, in response, has filed a motion for summary judgment raising a number of important first amendment issues. For the reasons stated below, the motion must be granted.
 II THE PROCEDURAL SETTING
The article and photograph in question were, as mentioned, published on October 2, 1996. The plaintiff (who is the photographed, but not the arrested, William B. Jones) commenced this action by service of process on November 7, 1996. There are five defendants: the Register; William J. Rush, the Register's chief executive officer and publisher; Jack Kramer and Charles P. Kochakian, both editors of the Register; and McClendon. The plaintiff's first revised complaint consists of five counts: the first count alleges libel per se; the second count alleges invasion of privacy; the third count alleges negligent infliction of emotional distress; the fourth count alleges intentional infliction of emotional distress; and the Fifth Count alleges a violation of Connecticut's Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq.
The defendants' answer filed on July 3, 1997, contains a number of special defenses. These include the sixth special defense, claiming that the plaintiff is a public figure; and the seventh special defense, claiming that the publication was privileged under the United States constitution. The defendants assert a number of other special defenses as well, but those defenses need not be considered here.
On December 9, 1999, the defendants filed the motion for summary judgment now before the court. The motion is based squarely on the defendants' assertion that the plaintiff is a public figure and that the requisite *Page 637 
malice cannot be proven. The motion was heard on January 26, 2000. Additional submissions were made by the parties on January 27, 2000.
 III THE ISSUES
The defendants, as I understand their submission, do not seriously contest the proposition that a jury could find the publication of the plaintiff's photograph in juxtaposition with the article in question to have been defamatory. Putting the question of public figure status to one side, case law establishes that an action for libel can lie in these circumstances. Consider, for example, Peck v. Tribune Co., 214 U.S. 185,29 S.Ct. 554, 53 L.Ed. 960 (1909). The Chicago Sunday Tribune published an endorsement of Duffy's Pure Malt Whiskey by one "Mrs. A. Schuman." The advertisement was accompanied by a portrait of "Mrs. A. Schuman," with a caption quoting her as saying that she had given that worthy beverage "years of constant use." Unhappily, the portrait was, in fact, a portrait of Peck, a teetotaler. The Supreme Court, in an opinion by Holmes, J., held that the portrait could be considered defamatory and that the asserted fact that it was published by mistake was no excuse. "If the publication was libellous the defendant took the risk." Id., 189. This remains the common law today. See Little Rock Newspapers, Inc. v.Fitzhugh, 330 Ark. 561, 568-69, 954 S.W.2d 914 (1997), cert. denied,523 U.S. 1095, 118 S.Ct. 1563, 140 L.Ed.2d 794 (1998), and authorities cited therein.
This case, however, is not solely governed by the common law. In one of the truly epochal judicial decisions of the twentieth century, the Supreme Court held in New York Times Co. v. Sullivan, 376 U.S. 254,84 S.Ct. 710, 11 L.Ed.2d 686 (1964), that a public official may not recover damages for a defamatory falsehood relating to his official conduct unless he proves that the *Page 638 
statement in question was made with "actual malice" — "that is, with knowledge that it was false or with reckless disregard of whether it was false or not." Id., 280.
The Sullivan rule has been significantly expanded in subsequent years. "Public figures" who are not public officials were brought within the ambit of the Sullivan rule by Curtis Publishing Co. v. Butts, 388 U.S. 130,155, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). A politician is the archetypal public figure. Partington v. Bugliosi, 825 F. Sup. 906, 917
(D.Hawaii 1993).
The plaintiff in this case is a former politician who was concededly once a public figure. One issue presented is whether he has retained his public figure status and, if so, just what kind of public figure he is. A second issue is whether the Sullivan rule can be sensibly applied in a case involving a photograph of a public figure mistakenly juxtaposed with an article about someone else. The final issue that must be addressed is whether the plaintiff has made the requisite showing of malice. These issues will be addressed in turn.
 IV PUBLIC FIGURE STATUS
This case raises the interesting and important question of whether a person who has at one time become a public figure can lose that status by subsequent years of relative obscurity. Although it would be imprudent to answer this question with a categorical "no," the record in this case is clear that the plaintiff has not lost his public figure status.
The plaintiff conceded at argument that he was a public figure in the 1970s. He was listed in every Register and Manual published by the secretary of the state between 1970 and 1979. According to that authority, he was an alderman representing the 22d Ward in New Haven from 1970 to 1977. In addition, from 1976 to *Page 639 
1977, he was Democratic town chairman of New Haven. From 1978 to 1979, he was the elected city and town clerk of New Haven. Beyond this, according to the plaintiff's original complaint, he was at one time "a candidate for the office of mayor of the City of New Haven."
The plaintiff did not hold elective office after 1979. He did not, however, entirely retire from public service. At the time of the publication in question, he had worked for the New Haven housing authority for a number of years "helping . . . minority contractors, to get jobs."
Even if the fact of his employment at the time of the publication is disregarded, the plaintiff remained a public figure. The plaintiff admits as much in his first revised complaint. That document, which is dated May 5, 1997, begins with the following paragraph: "At all times mentioned herein and for 30 years prior to the date of this complaint, the plaintiff, William B. Jones, — was a long-time resident of and a political office holder in the Town and City of New Haven, Connecticut and a long-time staff employee of the Housing Authority of the City of New Haven, Connecticut as well."
Paragraphs six and seven of the same document go on to state that: "During plaintiff's residency in New Haven, he has been favorably known in New Haven and elsewhere in the State of Connecticut by a large number of people as a politician and good citizen and in the past has been elected Town-City Clerk of New Haven and [as the] town chairman of the Democratic Party of said New Haven, Connecticut.
"As such and in such capacities, the plaintiff has enjoyed the reputation of being an honest law abiding citizen of integrity and fair dealing and has acquired and enjoyed and greatly values, the respect, esteem, goodwill and confidence of the people in New Haven *Page 640 
and throughout the State of Connecticut where he was likewise well known."
These statements, which purport to describe the circumstances in existence at the time of the publication in question, are judicial admissions of the plaintiff's public figure status.
In addition to the judicial admissions just described, an important body of case law must be considered. The Supreme Court of the United States has not yet decided "whether or when an individual who was once a public figure may lose that status by the passage of time." Wolston v.Reader's Digest Ass'n, Inc., 443 U.S. 157, 166 n. 7, 99 S.Ct. 2701,61 L.Ed.2d 450 (1979). Lower court cases may be found supporting either side.
A few cases, most of them exceedingly dated, have held that public figure status, once attained, can be eclipsed by years of subsequent obscurity. Preeminent among these is Melvin v. Reid, 112 Cal.App. 285,297 P. 91 (1931), the famous "Red Kimono" case. The plaintiff in that case had been a prostitute, as well as a defendant in a celebrated murder case, which resulted in her acquittal. Following her acquittal, "she abandoned her life of shame and became entirely rehabilitated . . . ." Id., 286. Seven years later, the defendants released a motion picture entitled "The Red Kimono" about her earlier life. This was held to violate her right to privacy. The court reasoned that a "change" had occurred in the plaintiff's life and that, "she should have been permitted to continue its course without having her reputation and social standing destroyed by the publication of the story of her former depravity." Id., 292.
Melvin represents something of a high-water mark for the privacy rights of the formerly famous. Nine years later, the Second Circuit reached a quite different conclusion in Sidis v. F-R Publishing Corp., 113 F.2d 806 *Page 641 
(2d Cir.), cert. denied, 311 U.S. 711, 61 S.Ct. 393, 85 L.Ed. 462
(1940). William Sidis had been a celebrated child prodigy in 1910. As the opinion of the court recounts, "At the age of eleven, he lectured to distinguished mathematicians on the subject of Four-Dimensional Bodies. When he was sixteen, he was graduated from Harvard College, amid considerable public attention." Id., 807. He subsequently disappeared into decades-long obscurity. In 1937, The New Yorker magazine published a "Where Are They Now?" article describing Sidis, his early accomplishments, and his later eccentricities, which included "his chosen career as an insignificant clerk" and "his enthusiasm for collecting streetcar transfers." Id. Sidis' action for invasion of privacy was unavailing. The Second Circuit held that it would allow, at a minimum, "limited scrutiny of the `private life' of any person who has achieved, or has had thrust upon him, the questionable and indefinable status of a `public figure.' " Id., 809. It explained that Sidis' subsequent history, containing as it did the answer to the question of whether or not he had fulfilled his early promise, was still a matter of public concern." Id. It further reasoned that: "Regrettably or not, the misfortunes and frailties of neighbors and "public figures" are subjects of considerable interest and discussion to the rest of the population. And when such are the mores of the community, it would be unwise for a court to bar their expression in the newspapers, books, and magazines of the day." Id.
The analysis of Sidis has proven to be much more persuasive than that of Melvin in modern times. Notable post-Sidis cases include Cohen v.Marx, 94 Cal.App.2d 704, 211 P.2d 320 (1949) (holding that a professional boxer named "Canvasback Cohen," who had retired in 1939, was still a public figure when Groucho Marx referred to him on the "You Bet Your Life" radio program in 1949); Werner v. Times-Mirror Co., 193 Cal.App.2d 111 *Page 642 4 Cal.Rptr. 208 (1961) (holding that a former Los Angeles politician, who had been mired in scandal in the late 1930s, remained a public figure when the Los Angeles Times wrote an article about his third wedding in 1958); and Rawlins v. Hutchinson Publishing Co., 218 Kan. 295, 543 P.2d 988
(1975) (holding that a police officer remained a public figure ten years after the fact). See also Milsap v. Journal/Sentinel, Inc., 100 F.3d 1265,1269-70 (7th Cir. 1996); Zerangue v. TSP Newspapers, Inc., 814 F.2d 1066,1069 (5th Cir. 1987); and authorities cited therein.
Sidis and its progeny are consistent with the reasoning of Dean Prosser in a much-cited article. Writing in 1960, Prosser explained that: "There can be no doubt that one quite legitimate function of the press is that of educating or reminding the public as to past history, and that the recall of former public figures, the revival of past events that once were news, can properly be a matter of present public interest. If it is only the event itself which is recalled, without the use of the plaintiff's name, there seems to be no doubt that even a great lapse of time does not destroy the privilege. Most of the cases have held that even the use of his name or likeness is not enough in itself to lead to liability. Thus a luckless prosecuting attorney who once made the mistake of allowing himself to be photographed with his arm around a noted criminal was held to have no remedy when the picture was republished fifteen years later in connection with a story of the criminal's career. Such decisions indicate that once a man has become a public figure, or news, he remains a matter of legitimate recall to the public mind to the end of his days." W. Prosser, "Privacy," 48 Cal. L. Rev. 383, 418 (1960).
All of these considerations — the plaintiff's own judicial admissions, the teaching of modern case authority, and the reasoning of academic writing — establish that the plaintiff, who was concededly a public figure in the *Page 643 
1970s, remained one at the time of the publication of the article in question in 1996.
The next question which must be addressed is what kind of public figure the plaintiff is. In Gertz v. Robert Welch, Inc., 418 U.S. 32394 S.Ct. 2997,41 L.Ed.2d 789 (1974), the Supreme Court distinguished between two types of public figures, commonly referred to as "general purpose" public figures and "limited purpose" public figures. The court explained that, "In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." Id., 351. As will be seen, this distinction is useful in applying the Sullivan rule to the facts of this case.
The pleadings and the facts submitted by the parties do not support a conclusion that the plaintiff is a limited purpose public figure. He is not a person who has injected himself or been drawn into "a particular public controversy" and thereby enjoyed his Warholian fifteen minutes of fame. Rather, the record shows, the plaintiff has had decades of fame, and he has had it not for a particular accomplishment, such as winning a prize or an athletic event, or for being involved in a particular controversy, but for devoting his life to public service for a period of many years.
The first revised complaint is telling on this point. As recounted above, the plaintiff describes himself in that pleading as having been, "for 30 years," "a political office holder," "a politician," and a "good citizen" and as being "well known" and "favorably known" as such "in New Haven and elsewhere in the State of Connecticut by a large number of people." *Page 644 
Gertz teaches that a plaintiff should not be found to be a "general purpose" public figure "[a]bsent clear evidence of general fame . . . in the community, and pervasive involvement in the affairs of society."Gertz v. Robert Welch, Inc., supra, 418 U.S. 352. By his own judicial admission, the plaintiff meets this test. The record establishes that he is a "general purpose" public figure.
 V APPLICATION OF THE SULLIVAN RULE
The difficult question of whether the Sullivan rule sensibly applies to the situation at hand must now be considered. Sullivan, as mentioned, establishes a first amendment defense applicable when a "public official" seeks to recover "damages for a defamatory falsehood relating to hisofficial conduct . . . ." (Emphasis added.) New York Times Co. v.Sullivan, supra, 376 U.S. 279. Similarly, the sole Supreme Court decision concerning the application of Sullivan to a former public official,Rosenblatt v. Baer, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966), involved a comment on the performance of that former official's "duty as a county employee." Id., 87 n. 14. The purpose of the Sullivan rule, as is well known, is to foster a "robust and wide-open" debate on the issues of the day. New York Times Co. v. Sullivan, supra, 270. The problem in this case is that the defamatory publication is not about the plaintiff's official conduct. Indeed, the article in question is not even about him. Rather, the article is about an entirely different person. Only the photograph is of the plaintiff, and that was, as the defendants concede, a mistake rather than a comment. Viewed in this light, this case is much closer to Peck than to Sullivan.
A number of other considerations, however, must be weighed in the scales of justice. Gertz points out that factual errors are an inevitable byproduct of a free *Page 645 
press, "[a]nd punishment of error runs the risk of inducing a cautious and restrictive exercise of the constitutionally guaranteed freedoms of speech and press." Gertz v. Robert Welch, Inc., supra, 418 U.S. 340. With respect to private individuals, that risk is counterbalanced by the legitimate state interest in compensating those individuals "for the harm inflicted on them by defamatory falsehood." Id., 341. But the balancing of interests is different when it comes to public figures. "Public officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy." Id., 344. More importantly, "There is a compelling normative consideration underlying the distinction between private and public defamation plaintiffs. An individual who decides to seek governmental office must accept certain necessary consequences of that involvement in public affairs. He runs the risk of closer scrutiny than might otherwise be the case." Id. "Those classed as public figures stand in a similar position. . . . For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. . . . [T]hey invite attention and comment." Id., 345.
The application of these principles to the problem at hand can be illustrated by a hypothetical presented by the court at argument. Suppose a New Haven resident, otherwise unknown, is fortuitously named William J. Clinton. This hypothetical local resident is arrested for stealing money from a local organization, and the Register publishes a front page story about the arrest. The text of the story is perfectly accurate, but accompanying the story is a photograph entitled "Clinton," and the photograph is — you guessed it — a photograph of the President of the United States. The President sues the Register for defamation. Does the Sullivan rule apply? *Page 646 
The plaintiff conceded at argument that the answer to this question is yes. This concession — while fatal to the plaintiffs cause — is almost certainly correct.
The considerations identified in Gertz make this result inevitable. The President, of course, is the quintessential "general purpose" public figure. He has access to many channels of effective communication and thus, has a realistic opportunity to counteract false statements concerning him. More important, by seeking public office, he has inevitably invited attention and as recent events have demonstrated all too well, every possible sling and arrow of public commentary will predictably be hurled in his direction. The rewards of public office are great, but this is the inevitable price.
Another consideration, not identified in Gertz, also plays a role. A false charge against a well known public figure is less likely to be believed than a false charge against a private person, at least if the act alleged is an improbable one. While P. T. Barnum's adage that there's a sucker born every minute cannot be completely disregarded, few people are likely to believe that the President, whatever his perceived faults, has committed the crime alleged here. Our hypothetical article is likely to be the cause of much amusement but little belief.
With this analysis in mind, let us return to the case at hand. Of course, the plaintiff does not enjoy the same focus of public attention as the President — no one does — but we are informed by his first revised complaint that for thirty years he has been "well known" "by a large number of people" in the city and the state "as a politician and good citizen." As such, he inevitably has greater access to channels of effective communication and hence has a more realistic opportunity to counteract false statements than private individuals normally enjoy. It is worth noting, in this respect, that the Register in this very case published a retraction, on *Page 647 
its own initiative, on the very next day following the publication in question.
Second, and more important, Jones is a voluntary public figure. His standing in the community has resulted from many years of office holding and public service. The rewards of such esteem are great, but they come at the price of scrutiny and comment, much of it inevitably unfair.
Third, given the admissions made in the first revised complaint, the implied allegation made by the publication of the plaintiff's photograph in juxtaposition with the article in question was highly unlikely to be believed. In this respect, the fact that the article concerns an entirely different person reduces the strength of the plaintiff's case rather than enhances it. The plaintiff was not the former treasurer of the NAACP, had not been convicted of stealing money from its coffers, and had not been placed on parole. All of those facts concerned the other William B. Jones. The plaintiff here was assertedly well known by a large number of people throughout the state as a politician and good citizen. Under these circumstances, it is hardly surprising that the record shows that the publication in question caused widespread amusement (even, we are told, to the plaintiff himself) rather than misguided belief.
The distinguishing factor of this case is that the plaintiff was a "general purpose" public figure. A private individual, such as the plaintiff in Peck, would not be in the same situation as the plaintiff here. A private individual would not have access to channels of effective communication, would not have sought the public limelight, and, because she would not be well known, would run a much greater risk that false charges against her would be believed. The same is true of "limited purpose" public figures. Little Rock Newspapers, Inc. v. Fitzhugh, supra, 330 Ark. 580-82. But "general purpose" *Page 648 
public figures, such as the plaintiff here, are different. By seeking — and attaining — the public limelight for a period of many years and being well known not for a particular achievement but in a variety of respects as citizens and politicians, "general purpose" public figures invite attention to all aspects of their lives. For these reasons, the Sullivan rule applies here, and the plaintiff can only succeed upon proper proof of actual malice.
 VI MALICE
"When, as here, the plaintiff is a public figure, he cannot recover unless he proves by clear and convincing evidence that the defendant published the defamatory statement with actual malice, i.e., with `knowledge that it was false or with reckless disregard of whether it was false or not.' New York Times Co. v. Sullivan, [supra,] 279-80 . . . "Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 510, 111 S.Ct. 2419,115 L.Ed.2d 447 (1991).
The "clear and convincing evidence" standard is relevant in ruling on a motion for summary judgment in a defamation action brought by a public figure. In ruling on a motion for summary judgment in this context, "the judge must view the evidence presented through the prism of the substantive evidentiary burden." Anderson v. Liberty Lobby, Inc.,477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Thus, where the factual dispute concerns actual malice, clearly a material issue in a [Sullivan] case, the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not." Id., 255-56. (Footnote omitted.) *Page 649 
"The phrase `actual malice' is unfortunately confusing in that it has nothing to do with bad motive or ill will." Harte-Hanks Communications,Inc. v. Connaughton, 491 U.S. 657, 666 n. 7, 109 S.Ct. 2678,105 L.Ed.2d 562
(1989). The real question to be addressed by the court is whether the allegedly defamatory publication was made "with knowledge of falsity or reckless disregard as to truth or falsity." Masson v. New YorkerMagazine, Inc., supra, 501 U.S. 511. For reasons already explained, it is the burden of the plaintiff to prove malice, thus defined, by clear and convincing evidence. A careful review of the evidence submitted by the parties firmly establishes that the plaintiff here is unable to meet this burden.
The submissions of the defendants amply document their assertion that the publication here was a simple mistake, arguably the result of negligence but not the result of malice as that term is defined by the courts. As mentioned, the Register, on its own initiative, published a retraction on the very next day.
The submissions by the plaintiff contain nothing approaching clear and convincing evidence to the contrary. The plaintiff points to the deposition testimony of Sally Brown that she is "seventy-five percent sure" that McClendon told her "that he had alerted somebody in the Register that there were two Bill Joneses and they should be careful to publish the right picture." The plaintiff, however, has not identified just who that "somebody" was. It could have been the publisher or a mail clerk. We simply do not know. This is not clear and convincing evidence.
For these reasons, the plaintiff's case is, at best, a case of negligence built on the sand of surmise. It is emphatically not a case of malice established on the rock of clear and convincing evidence. *Page 650 
The first amendment principles discussed above are dispositive of the plaintiff's libel claim. Because his claims of invasion of privacy, negligent infliction of emotional distress, intentional infliction of emotional distress, and CUTPA violation attack the same act of protected speech, the principles that have been identified are dispositive of those claims as well. Time, Inc. v. Hill, 385 U.S. 374, 387-88, 87 S.Ct. 534,17 L.Ed.2d 456 (1967).
 VII CONCLUSION
The defendants' motion for summary judgment is granted.