## LITTLE ROCK NEWSPAPERS, INC. *v.*
## J. Michael FITZHUGH

96-1050 954 S.W.2d 914

Supreme Court of Arkansas
Opinion delivered November 13, 1997
[Petition for rehearing denied January 8, 1998.*]

* BROWN and IMBER, JJ., not participating.

*Williams & Anderson,* by: *Philip S. Anderson, John E. Tull III,* and *Leon Holmes;* and *Hardin, Dawson & Terry,* by: *Rex M. Terry,* for appellant.

*Everett Law Firm,* by: *Thomas A. Mars,* for appellee.

DONALD L. CORBIN, Justice. Appellant Little Rock Newspapers, Inc., appeals the judgment of the Sebastian County Circuit Court imposing the jury's verdict awarding $50,000 in damages to Appellee J. Michael Fitzhugh for his defamation claim against Appellant's newspaper, the *Arkansas Democrat-Gazette.* Our jurisdiction of this appeal is pursuant to Ark. Sup. Ct. R. 1-2(a)(15), as it presents questions concerning the law of torts. Appellant raises four points for reversal. We find no error and affirm.

The record reflects that on Monday, June 20, 1994, the *Arkansas Democrat-Gazette* printed an article on the front page of its "Arkansas" section entitled, "Whitewater counsel kicks off first prosecution." There were two photographs included in the article — one of Charles Matthews, with the caption "Matthews" beneath it and one of Appellee, with the caption "Fitzhugh" beneath it. The substance of the article is as follows:

*Whitewater counsel kicks off first prosecution*

The first case to be prosecuted by the office of Robert Fiske Jr., the special counsel in the Whitewater Development Corp. affair, is to start in U.S. District Court at Little Rock today.

But don't look for the prominent political figures usually associated with Fiske's investigation.

The defendants are Charles Matthews and Eugene Fitzhugh. The men are little known outside Little Rock, and their attorneys argue the case doesn't belong under Fiske's jurisdiction.

Matthews, Fitzhugh and former Pulaski County Municipal Judge David Hale were indicted by a federal grand jury last fall for conspiring to defraud the Small Business Administration of $900,000 through Hale's federally licensed lending company, Capital Management Services Inc. of Little Rock.

Capital Management Services was supposed to raise capital to match money from the SBA and then make loans to socially and economically disadvantaged companies.and individuals.

Fitzhugh's attorney, Randy Satterfield of Little Rock, said his client's defense is that "he's pretty much a victim of some big scheme that Hale had going on."

Hale helped fuel calls for the Whitewater investigation — and Fiske's eventual appointment in January by Attorney General Janet Reno — by alleging that then-Gov. Bill Clinton pressured him during the 1980s to make a $300,000 loan to Susan McDougal.

The president and first lady Hillary Rodham Clinton were partners with James and Susan McDougal from 1978-92 in Whitewater, a 230-acre residential development along the White River in Marion County.

James McDougal also owned Madison Guaranty Savings & Loan Association, which failed in 1989 at a cost to taxpayers of at least $47 million. Fiske is investigating allegations that money was transferred illegally from Madison accounts to Whitewater accounts.

Hale pleaded guilty to two felonies in March. His sentencing is on hold while the government evaluates his cooperation with Fiske's investigation.

Fitzhugh and Matthews have said that if anybody defrauded the SBA, it was Hale. Yet their link to Whitewater — however small — will ensure national news coverage of their trial.

Satterfield said he has been contacted by reporters from *The New York Times*, *USA Today* and other publications.

Fitzhugh has tried unsuccessfully to have Fiske disqualified from the case, arguing the Whitewater connection has turned the trial into a "media event."

The prosecution will be handled by two associate counsels in Fiske's office.

Fitzhugh and Matthews are accused of using a wealthy Shreveport family's money to help Hale misrepresent the amount of private capital held by his company. That misrepresentation allegedly allowed the company to qualify improperly for $900,000 from the SBA.

Matthews and Fitzhugh split $250,000 as their payoff, the government contends.

Fitzhugh, a Little Rock lawyer, represented a member of the Shreveport family.

Matthews, a North Little Rock lawyer and former securities dealer, handled some of the family's investments. Matthews was a state representative and chairman of the Arkansas Democratic Party in the late 1960s.

Court papers filed by the government and defense lawyers recently indicate how the trial may proceed.

The government says it can make its case without testimony from Hale.

Fiske's office, however, said it expects defense attorneys to call Hale as a witness to discredit him.

Prosecutors have asked U.S. District Judge Stephen Reasoner to limit Hale's testimony about his crimes to prevent distracting the jury from the "relevant issues" in the case.

"The obvious ploy is to set up Hale as a straw man," prosecutors argued last week in a motion to limit testimony about Hale's confessed crimes.

Satterfield said he has subpoenaed Hale.

"There's a lot of activity about limiting his testimony, so I don't know" whether to call him, the lawyer said.

The government also has argued that unlimited examination of Hale could damage Fiske's investigation of other matters.

A spokesman for Fiske's office said the prosecution hopes to present its case "within a week" but declined to respond to other questions.

Satterfield said he expects the trial to last no more than a week.

After receiving telephone calls from Appellee, the newspaper printed a correction the following day. The correction, which was printed in the lower left corner of the front page of the "Arkansas" section under the headline of "Getting it straight," included a true photograph of Eugene Fitzhugh. The correction read:

On Monday on the front of the Arkansas section a photo of J. Michael Fitzhugh was run in place of a photo of Eugene Fitzhugh. The correct photo of Eugene Fitzhugh is shown.

Appellee filed his complaint against Appellant on September 2, 1994, alleging that the juxtaposition of his photograph against the headline and accompanying article was defamatory *per se* and was the result of gross carelessness on the part of Appellant's employees. In its answer, Appellant asserted that Appellee was a public figure and that, as such, it was necessary for Appellee to prove that its employees acted with actual malice in placing Appellee's photograph in the Whitewater article.

## I. Sufficiency of the Evidence

For its first two points for reversal, Appellant argues that the trial court erred in denying its motion for summary judgment and for refusing to grant a directed verdict in its favor. Appellant contends that Appellee failed to prove that the article in question was a false statement of fact of and concerning him and that his reputation was actually harmed as a result of the article's publication. Appellant does not challenge the amount of damages awarded to Appellee by the jury; rather, it challenges the award of any damages.

We first note that the denial of a motion for summary judgment is not reviewable on appeal. *Pugh v. Griggs*, 327 Ark. 577, 940 S.W.2d 445 (1997); *White v. Welsh*, 327 Ark. 465, 939 S.W.2d 299 (1997). Such review is not available even after a trial on the merits, as the final judgment must be tested upon the record as it exists at the time it is rendered, rather than at the time the motion for summary judgment is denied. *Ball v. Foehner*, 326 Ark. 409, 931 S.W.2d 142 (1996). Hence, we review only Appellant's argument as it pertains to the trial court's denial of its motion for directed verdict.

A motion for directed verdict should only be granted if the evidence is so insubstantial as to require that the jury's verdict be set aside. *Dodson v. Dicker*, 306 Ark. 108, 812 S.W.2d 97 (1991). In reviewing the denial of a directed verdict, we give the evidence its highest probative value, viewing it in a light most favorable to the party against whom the verdict is sought. *Id.* The standard of review in cases of defamation, including factual findings, is whether the jury's verdict can be supported by substantial evidence. *Thomson Newspaper Publishing, Inc. v. Coody*, 320 Ark. 455, 896 S.W.2d 897, *cert. denied*, 116 S. Ct. 563 (1995). An action for defamation turns on whether the communication or publication tends or is reasonably calculated to cause harm to another's reputation. *Id.*; *Little Rock Newspapers, Inc. v. Dodrill*, 281 Ark. 25, 660 S.W.2d 933 (1983).

In order to establish a claim of defamation, a party must prove the following elements: (1) The defamatory nature of the statement of fact; (2) that statement's identification of or reference to the plaintiff; (3) publication of the statement by the defendant; (4) the defendant's fault in the publication; (5) the statement's falsity; and (6) damages. *Minor v. Failla*, 329 Ark. 274, 946 S.W.2d 954 (1997) (citing *Mitchell v. Globe Intern. Pub., Inc.*, 773 F. Supp. 1235 (W.D. Ark. 1991)).

## A. *False Statement of and Concerning Appellee*

Appellant relies on this court's decision in *Pigg v. Ashley County Newspaper, Inc.*, 253 Ark. 756, 489 S.W.2d 17 (1973), for the proposition that in determining whether an article is libelous,

we must construe the article in its entirety. Appellant asserts that in reading the present article as a whole, it cannot reasonably be construed as being a false statement of fact of and concerning Appellee. Appellant asserts that the evidence demonstrated that the article is clearly of and concerning Eugene Fitzhugh, identified in the article as a Little Rock lawyer who is not a prominent figure and is little known outside of Little Rock. We disagree.

■ Whether the words, taken together with the attendant circumstances, implicate the plaintiff in the commission of a crime is a question of fact for the jury to resolve. *Minor*, 329 Ark. 274, 946 S.W.2d 954. The question of whether a jury may reasonably determine that the placement of a plaintiff's photograph in a potentially defamatory article was a false statement of fact of and concerning that plaintiff is an issue of first impression in this State. We thus look to other jurisdictions for guidance.

In *Brown v. Tallahassee Democrat, Inc.*, 440 So. 2d 588 (Fla. App. 1983), cited by Appellee in his brief, the article, headlined "Prosecution rests case in Madison murder trial," described the criminal defendant Larry Joe Johnson, but contained a photograph of the appellant Brown with the caption "Johnson" beneath it. The Florida court noted at the outset that the "allegedly defamatory publication must be considered in its entirety rather than with an eye constrained to the objectionable feature alone." *Id.* at 589. In so construing the article, the court concluded that it was error for the trial court to have granted summary judgment to the newspaper because, given the juxtaposition of Brown's photograph, the ordinary reader may have been left with the sense that Brown was guilty of or on trial for murder.

In *James v. Fort Worth Telegram Co.*, 117 S.W. 1028 (Tex. Civ. App. 1909), the Texas Court of Civil Appeals reviewed a defamation case involving an article describing an ax-murderer, Daniel Herring, which contained a photograph of the appellant James. The court held that the article "should be construed as imputing the homicide to the man whose picture, forming a part of the publication, was identified by references to it as that of the man who did the killing." *Id.* at 1029. The court went on to hold that

because it was undisputed that the photograph was of James, the publication clearly imputed the killing to him.

Similarly, in *Farley v. Evening Chronicle Pub. Co.*, 87 S.W. 565 (1905), the Missouri Court of Appeals held that whether a photograph of the appellant Farley included in a newspaper article about a person of the same name, who was described as a strikebreaker, was defamatory to Farley was a question for the jury to resolve. The court stated:

> If we scrutinize yet more closely the publication of the article and the picture, the conclusion cannot be escaped that the defendant's editor intended the readers of his paper to understand that the person whose picture was published was the person to whom the article alluded. In that sense the article meant and referred to this plaintiff, and he was intended to be described by the writer.

*Id.* at 570.

In accordance with the holdings espoused in the above-cited cases, we conclude that there was sufficient proof for the trial court to submit to the jury the issue of whether the article could be construed as being a false statement of and concerning Appellee. It is undisputed that Appellee's photograph was contained in the article and that the caption under the photograph stated "Fitzhugh," as opposed to "Eugene Fitzhugh." It is also undisputed that the subject of the article was referred to as merely "Fitzhugh" seven different times. Several witnesses, all friends or acquaintances of Appellee, testified that they initially believed the article was about Appellee due to the inclusion of Appellee's photograph in the article. Additionally, one witness indicated that he and his wife had wondered whether Appellee's middle name was Eugene, which is Appellee's brother's name. There was thus sufficient evidence presented by Appellee's witnesses upon which the jury could have reasonably determined that persons who were not so personally acquainted with Appellee may have been left with the permanent impression that Appellee was charged with a crime in the Whitewater scandal. We thus turn to the issue of Appellee's proof of damages.

## B. Damage to Appellee's Reputation

Appellant argues that Appellee failed to prove specific, actual injury to his reputation because none of the witnesses testified that Appellee's reputation had actually suffered or that they looked badly upon him as a result of the article's publication. Appellant argues further that although Appellee may have produced evidence that generally established that any person associated with the Whitewater scandal would have been harmed, he failed to produce any evidence demonstrating that he, personally, had suffered an injury to his reputation. We disagree.

In the landmark case of *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), the Supreme Court held that states may not permit recovery of presumed damages in actions for defamation absent a showing of knowledge of falsity on the part of the publisher or a reckless disregard for the truth. This holding applies equally to those plaintiffs who are private figures and those who are classified as public figures or officials. On the issue of proof of damages, the Court stated:

> We need not define "actual injury," as trial courts have wide experience in framing appropriate jury instructions in tort actions. *Suffice it to say that actual injury is not limited to out-of-pocket loss. Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering.* Of course, juries must be limited by appropriate instructions, and all awards must be supported by competent evidence concerning the injury, *although there need be no evidence which assigns an actual dollar value to the injury.*

*Id.* at 349–50 (emphasis added). Thus, the Court left to the states the question of what particular proof of damages must be offered by the plaintiff in order to show that he or she had suffered "actual injury" as a result of the defamation. As pertains to such actions in this State, part of that question was answered by this court in *Dodrill*, 281 Ark. 25, 660 S.W.2d 933.

In *Dodrill*, which is relied upon heavily by Appellant, this court rejected the notion expressed by the Court in *Gertz* and later in *Time, Inc. v. Firestone*, 424 U.S. 448 (1976), that the Con-

stitution does not require proof of injury to reputation before recovery for mental suffering can be had. Instead, this court held that in Arkansas, an action for defamation has always required proof of reputational injury:

> It is settled law that damage to reputation is the essence of libel and protection of the reputation is the fundamental concept of the law of defamation. The action turns on whether the communication or publication tends or is reasonably calculated to cause harm to another's reputation. Such injury to reputation is a prerequisite to making out a case of defamation and an action lacking that claim becomes another cause of action.

*Id.* at 28, 660 S.W.2d at 935 (footnote and citations omitted). In support of its conclusion that there must be proof of injury to reputation, and in accordance with the holding in *Gertz* that damages to reputation may not be presumed in cases involving First Amendment rights, this court stated:

> To allow recovery in a defamation action where the primary element of the cause of action is missing not only sets the law of defamation on end, but also substantially undercuts the impact *Gertz* seeks to effect. The law of defamation has always attempted to balance the tension between the individual's right to protect his reputation and the right of free speech. To totally change the character of defamation to allow recovery when there has been no loss of the former right, would be an unjustified infringement on the First Amendment.

*Id.* at 31, 660 S.W.2d at 936. Undeniably, the present case is one involving First Amendment rights. As such, damages may not be presumed. The question then is how much proof of actual injury to reputation is sufficient to render the issue one for the jury to resolve.

Appellee points to this court's subsequent decision in *Hogue v. Ameron, Inc.*, 286 Ark. 481, 695 S.W.2d 373 (1985), in support of his assertion that there was sufficient evidence from which the jury could have concluded that his reputation was damaged. In *Hogue*, the appellant, an Arkansas State Police trooper, filed an action for defamation on the basis of a letter written to his superiors stating that the appellant had been photographed driving an unlicensed vehicle. At trial, the appellant testified that his reputa-

tion had been harmed by the ensuing investigation. Another witness testified vaguely that the appellant's reputation had changed for the worse at about the time of the investigation. Concluding that the trial court erred in granting a directed verdict against the appellant, this court held that where there was some evidence of harm to the appellant's reputation, it was a question for the jury to resolve. Notwithstanding the holding in *Hogue*, the question still remains as to what particular type of proof is sufficient to sustain a jury's verdict in favor of a plaintiff in a defamation action. In order to resolve this question, it is necessary to look beyond the decisions of this court.

In *Salomone v. MacMillan Publishing Co., Inc.*, 429 N.Y.S.2d 441 (N.Y. App. Div. 1980), the New York Supreme Court, Appellate Division, held that the plaintiff in a libel suit, who was a private individual, had failed to prove any damages compensable in law. The subject of the libel action was a parody of a children's book of cartoons entitled *Eloise*. The original children's book was about a fictional six-year-old girl who lived at the Plaza Hotel with her nanny. One of the book's drawings showed a man bowing from the waist and Eloise curtseying in return, with the caption referring to the man as Mr. Salomone, the hotel manager. In the parody of the book, entitled *Eloise Returns*, the opening drawing shows Eloise in the men's room of the hotel, where the walls are now covered with graffiti. On a large mirror, underneath where the girl is writing "Eloise Returns," are the words "Mr. Salomone was a child molester." Plaintiff Salomone was the manager of the Plaza Hotel when the original *Eloise* was written. He filed suit for libel against the publisher of *Eloise Returns*, who was shocked to learn that Mr. Salomone was anything other than a fictional character. New York law required the plaintiff in such actions to prove damage to his reputation; evidence that the plaintiff had suffered embarrassment and mental anguish was not sufficient to support an award of damages. In concluding that the plaintiff's damages were insufficient, the court held:

> He claims damages for loss of reputation and for mental anguish. He has been unable to come forth with any proof of loss of reputation *because he knows of no one who believes he was a child molester or thinks less of him due to the publication. . . .* While

the U.S. Supreme Court, in *Gertz*, would appear to have allowed the states sufficient latitude to include in the definition of "actual injury" mental anguish unaccompanied by loss of reputation, this has not occurred in this state.

*Id.* at 442–43 (citations omitted) (emphasis added).

■ The holding in *Salomone* thus indicates that proof of damage to reputation may include: (1) Proof that people believed the plaintiff to be guilty of the conduct asserted in the publication, or (2) proof that people thought less of the plaintiff as a result of the publication's defamatory content. We view that language as persuasive authority on the issue presented in this case, given that the law applied in *Salomone* parallels the applicable law in this State, requiring proof of injury to reputation above and beyond that of mental suffering or anguish. Hence, the pertinent question now before us is whether it was sufficient proof that the witnesses who read the article initially believed that Appellee was the subject of the stated Whitewater investigation. After reviewing the testimony, we conclude that the proof was sufficient.

Appellee testified that he believed that the article's publication throughout the state had damaged his reputation. In this respect, Appellee indicated that he was aware of this because people had told him it had had an effect. He gave numerous examples of how he was harmed by the article. He stated that a fellow lawyer had driven by him and made a comment about the article and how Appellee was the subject of conversation in that lawyer's law firm. He stated that a friend of his, Gilbert Travis, had called and wanted to know what Appellee's middle name was and that Travis had told him that he had seen the article and thought it was about Appellee because his photograph was attached. He stated that a childhood friend, Mackie Watson, had seen him at a soccer tournament and had loudly inquired as to whether Appellee's name was "Michael Eugene" or "J. Michael." He stated that Watson then told him that she had spoken to Jeannie Luttrell about the article. Appellee stated further that he had been kidded about the article by some people but that he had never thought it was funny. He stated that he did not want to be connected with the Whitewater prosecution because it is a stain on the State of Arkansas and the legal profession in general. Additionally, he stated that

he had had difficulty sleeping and that he would wake up during the night thinking about the article.

Jeannie Luttrell, a childhood friend of Appellee's, testified that when she saw the article and Appellee's photograph, she believed it was about him, even though she indicated that it was hard for her to believe that about Appellee because of his high moral character. When asked what she believed had happened to Appellee, she explained:

> I believed that he probably lost his job as a federal prosecutor when the administration changed, and that perhaps he had moved to Little Rock, and he somehow got involved with these people. It was hard for me to believe that because they were Democrats and Mike was Republican, but I believed it.

Luttrell stated that she had talked to some people about the article and that she had continued to believe that the article was about Appellee until she was told by Mackie Watson, some months later in the fall of 1994, that the article was not about him.

Dr. Cole Goodman, Appellee's friend, stated that at the time Appellee went into private practice in Fort Smith, he had an excellent reputation. He stated that when he had initially seen the June 20, 1994 article and Appellee's photograph, he thought that Appellee must have been prosecuting the case. He stated that when he remembered that Appellee was no longer a prosecutor, he read the article. Upon seeing the name "Eugene Fitzhugh," he stated that he thought the newspaper had confused Appellee's name with that of his brother Eugene. In explanation of his reaction to the article, he stated: "And then I read through this and saw where these people had defrauded a significant amount of money, and my initial response then was to get perturbed at Mike for doing this." He stated that upon rereading the article, however, he realized that it was not about Appellee.

Gilbert Travis, another friend of Appellee's, testified that he was reading the newspaper on June 20, 1994, when he saw Appellee's photograph with the article describing Eugene Fitzhugh. He stated that he then called to his wife and asked her what other name Appellee went by besides Mike, to which his wife responded that she did not know. He stated that he had con-

cluded from the article that Appellee was in trouble. He stated that he then called Appellee to see if he could do anything to help him.

Similarly, Howard Pearson, the principal at Ramsey Junior High School and Appellee's wife's boss, stated that he had viewed the article as a whole as indicating that Appellee had done something wrong. He stated that he had trouble believing it, but that he did believe it because it contained Appellee's photograph.

Asa Hutchinson, former United States Attorney and Appellee's former boss, testified generally as to the effect of such an article on a lawyer's reputation. When asked to relate to the jury his experience in trying to establish a private law practice in Fort Smith after having been employed as a federal prosecutor, Hutchinson stated that it takes a significant amount of time to build up a client base and that the way to generate clients was through experience and personal reputation. Hutchinson stated that from both a personal and professional standpoint, a lawyer's chief asset is his reputation. When asked if he felt that being accused of wrongdoing in connection with Whitewater would have damaged his reputation, Hutchinson stated that "[i]t would harm anyone's reputation."

Robert Lutgen, managing editor of the *Arkansas Democrat-Gazette*, testified that the article had caused some damage to Appellee and was embarrassing to him, but that it was the newspaper's position that the article had not caused "significant damage" to Appellee. Lutgen admitted that Whitewater was the biggest news story that the newspaper had covered since 1992. When asked to explain how much damage had been caused to Appellee, Lutgen echoed Appellee's earlier testimony that there was probably not any way of actually measuring the damage done to him. Lutgen finally stated that it was the newspaper's position that the article had caused "minor damage" to Appellee.

Appellee contends that Lutgen's testimony alone is sufficient proof of damage to his reputation. Appellant, on the other hand, attempts to shrug off Lutgen's testimony by arguing that he never specifically testified that the article had caused damage to Appellee's *reputation*, but rather, only that the article had caused damage

in general. We are not persuaded by Appellant's argument. Instead, we conclude that a fair reading of Lutgen's testimony *in toto* indicates that the damage to which he was referring was damage to Appellee's reputation. A review of Lutgen's testimony demonstrates that prior to his answering questions concerning the amount of damage sustained by Appellee, he stated that Appellant's newspaper had the ability to severely damage a person's reputation by printing false information about that person.

 The foregoing testimony demonstrates that Appellee's reputation was injured as a result of Appellant's publication of the defamatory article. This proof is most evident through the testimony of the various witnesses who believed that Appellee was involved in the Whitewater investigation. The fact that some of the witnesses' beliefs were held only for a short period of time is of no consequence to Appellant. What is significant is that those persons believed that Appellee was the subject of the article and was, thus, the target of a criminal investigation. We reject Appellant's argument that Appellee failed to show that people thought less of him as a result of the article. The fact that the witnesses believed that Appellee was charged with a crime involving the Whitewater scandal demonstrates that they thought less of Appellee as a result of the article. Moreover, we are persuaded by Appellee's assertion that none of the witnesses who were personally acquainted with him would have thought badly of him on a permanent basis because they were able to personally verify that he was not the person being charged with the Whitewater crimes. On the other hand, persons who were not personally acquainted with Appellee would not have been capable of verifying the truth nor would they have been known to Appellee so that he could secure their testimony for trial. We thus conclude that the trial court did not err in denying Appellant's directed-verdict motion, as the proof presented at trial was sufficient to sustain the jury's conclusion that Appellee's reputation had been damaged as a result of Appellant's negligent publication of his photograph with the article.

## II. Public Figure/Actual Malice

For its final two points for reversal, Appellant argues that the trial court erred in refusing to declare Appellee to be a public figure and, correspondingly, in refusing to instruct the jury that Appellee had the burden of proving that the newspaper acted with actual malice in publishing the defamatory falsehood. Appellant's contention that Appellee is a public figure is based upon the fact that he had been a United States Attorney for a period of some eight years. Appellee concedes that he was and still is a public figure for the limited purpose of any article or news story concerning his actions as a federal prosecutor. He disputes, however, that he was a public figure within the context of the Whitewater investigation, which was the subject of the defamatory article.

Evidence presented at trial established that Appellee became an Assistant United States Attorney for the Western District of Arkansas in May 1974. Appellee remained in that position until November 1985, when he was appointed as temporary or acting United States Attorney for the Western District of Arkansas, replacing Asa Hutchinson, who had resigned to run for the United States Senate. Appellee was later appointed permanently as United States Attorney for that district, a position he held until he resigned in March 1993. During his tenure as United States Attorney, Appellee had participated in several press conferences, had been named in numerous newspaper articles, and had routinely issued press releases pertaining to investigations that his office was conducting. Appellee had also been the subject of a local television news broadcast, detailing his life and work in the Fort Smith community. Additionally, Appellee had twice submitted his name for appointment to a federal judgeship approximately three to four years before the article was printed, although he was not successful in that endeavor. Appellee had never sought elective office. Appellee joined the Bethell law firm in Fort Smith in August 1993. A telephone book advertisement for the Bethell law firm identified Appellee as a former United States Attorney. Appellant asserts that such evidence demonstrates that Appellee was a public figure under the standard established in *Gertz*. We disagree.

Whether an individual is a public official or a public figure is a mixed question of fact and law that is for the trial court to determine. *See, e.g., Gertz*, 418 U.S. 323; *Cornett v. Prather*, 293 Ark. 108, 737 S.W.2d 159 (1987). In *Gertz*, the Supreme Court held that public figures normally enjoy greater access to effective channels of communication and, thus, have more realistic opportunities to counteract false statements than do private individuals. The Court described public figures as those persons who:

> have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment.

*Id.* at 345. A private individual, on the other hand, has not accepted public office nor assumed an "influential role in ordering society." *Id.* (citing *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 164 (1967) (Warren, C. J., concurring in result)). A private individual has not relinquished his interest in the protection of his own good name, and consequently has a more compelling case for redress of injury inflicted by defamatory falsehood. *Id.* Holding that the designation of a public figure may rest on either of two alternative bases, the Court stated:

> In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions.
>
> . . . Absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life. *It is preferable to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation.*

*Id.* at 351-52 (emphasis added).

The facts of that case demonstrated that Gertz was an attorney representing the family of a juvenile who had been shot and killed by a Chicago police officer. The officer had been convicted of second-degree murder, and his conviction had generated considerable publicity. The civil litigation, brought by the family against the officer, received national attention when the respondent published an article in *American Opinion*, a monthly magazine espousing the views of the John Birch Society, that contained numerous inaccuracies about Gertz. The article labeled Gertz as a criminal, a Leninist, a Communist-fronter, an official of the "Marxist League for Industrial Democracy," and an instigator of the riots that had occurred at the 1968 Democratic National Convention in Chicago. The Court concluded that based upon the facts of that case, Gertz was not a public figure, as he did not "thrust himself into the vortex of this public issue, nor did he engage the public's attention in an attempt to influence its outcome." *Id.* at 352. Rather, the Court declared that Gertz's participation in that public issue related solely to his representation of a private client.

Since *Gertz*, courts have construed the term "public figure" narrowly, with a greater emphasis on the plaintiff's status as it relates to the subject of the defamation. In *Time, Inc. v. Firestone*, 424 U.S. 448 (1976), the Court held that the respondent, the ex-wife of Russell Firestone (the descendant of the wealthy Firestone Tire family), was not a public figure for purposes of an article in *Time* magazine about the Firestones' divorce. The Court held that notwithstanding that there may have been public interest in the wealthy couple's divorce, Mrs. Firestone was not a public figure because she had not assumed "any role of especial prominence in the affairs of society, other than perhaps Palm Beach society, and she did not thrust herself to the forefront of any particular public controversy in order to influence the resolution of the issues involved in it." *Id.* at 453.

In the initial *Dodrill* appeal, *Dodrill v. Arkansas Democrat Co.*, 265 Ark. 628, 590 S.W.2d 840 (1979), *cert. denied*, 444 U.S. 1076 (1980), this court held that the plaintiff, a Little Rock attorney

who had been previously suspended from the practice of law pending his retaking the bar examination, was not a public figure for purposes of an article published in the *Arkansas Democrat* reporting that Dodrill had failed the exam. The evidence showed that Dodrill had not failed the exam, only that his name had been initially withheld from publication pending further investigation of his readmission by the Board of Bar Examiners. The newspaper had argued that Dodrill was a public figure within the context of the public controversy surrounding his suspension from the bar. This court rejected that argument, holding that there was no evidence that demonstrated that Dodrill had thrust himself into the vortex of public controversy or that he had taken steps to attract public attention or to achieve a degree of public acclaim.

In *Ryder v. Time, Inc.*, 557 F.2d 824 (D.C. Cir. 1976), a case of mistaken identity, the United States Court of Appeals for the District of Columbia held that the plaintiff, Richard J. Ryder, a lawyer and former Virginia state legislator, was not a public figure for purposes of an article in *Time* magazine reporting that Virginia attorney Richard Ryder (actually referring to Richard R. Ryder) had been suspended from the practice of law because he had concealed stolen money and a sawed-off shotgun belonging to his client. The court held that while it was true that the plaintiff had been a public official and had been a candidate for public office, his public activities had nothing to do with the reference to Richard Ryder's illegal activities mentioned in the article.

The Supreme Court of New Mexico concluded that the appellant Marchiondo, a well-known attorney and member of the Democratic Party, was not a public figure for purposes of his action against a journal for defamation in connection with an article containing his photograph and detailing organized crimes' interest in New Mexico. *Marchiondo v. Brown*, 649 P.2d 462 (N.M. 1982). The court so held because Marchiondo had not voluntarily injected himself into the controversy on organized crime.

Likewise, the Texas Court of Appeals held that an attorney who had been appointed as a special counsel to a court of inquiry, and had served as such until about two months prior to the

defamatory news broadcast, was not a public figure in connection with a news story linking him to the Chicken Ranch, a local club used as a front for various activities including orgies and prostitution. The court noted that the fact that the plaintiff had held a number of press conferences as special counsel for the court of inquiry did not render him a public figure within the limited context of his alleged involvement with the Chicken Ranch. *Durham v. Cannan Communications, Inc.*, 645 S.W.2d 845 (Tex. App. 1982).

Even well-known Wyoming defense attorney Gerry Spence was deemed not to have been a public figure within the context of his defamation suit against *Hustler* magazine. *Spence v. Flynt*, 816 P.2d 771 (Wyo. 1991), *cert. denied*, 503 U.S. 984 (1992). The article, which was more like an editorial, blasted Spence for his representation of Andrea Dworkin in her pornography suit against publisher Larry Flynt. The Supreme Court of Wyoming held that although Spence may have been a public figure for some purposes, he was not a public figure for his representation of a client in a lawsuit.

Based upon the above-recited case law and the circumstances of this case, we conclude that Appellee was not a public figure for all purposes, nor was he a limited-purpose public figure within the context of the Whitewater investigation. Although Appellee did have some connection to the Whitewater investigation through his representation of two witnesses, the evidence revealed that he had not actually represented one of those witnesses until after the article in question had been published. Moreover, as noted by the Supreme Court in *Gertz* and the Wyoming Supreme Court in *Spence*, the mere fact of an attorney's representation of a client involved in a matter of public controversy does not, in itself, automatically render the attorney a public figure within the context of the controversy. In short, there was no evidence presented at trial showing that Appellee had thrust himself into the vortex of the Whitewater controversy, or that he had engaged the public's attention in an attempt to influence the outcome of the controversy.

Furthermore, Appellee did not, by virtue of his having been a federal prosecutor for eight years, occupy a position of

persuasive power and influence or one of especial prominence in the affairs of society, such that he could be labeled an all-purpose public figure. While it is true that Appellee had been a public official and may have had some influence over societal affairs in Fort Smith during his tenure as United States Attorney, his public activities had nothing to do with the subject of the newspaper article. In short, there was no clear evidence presented at trial showing that Appellee had achieved such general fame and notoriety throughout the state, where the newspaper was circulated, such that would render him a public personality for all aspects of his life.

 Because we conclude that Appellee was a private individual within the context of this lawsuit, it necessarily follows that the trial court did not err in instructing the jury that Appellee was only required to prove negligence, rather than actual malice.

Affirmed.

Special Justices TRUMAN YANCEY and PAT HALL join in this opinion.

ARNOLD, C.J., NEWBERN and THORNTON, JJ., dissent.

BROWN and IMBER, JJ., not participating.

DAVID NEWBERN, Justice, dissenting. In seeking a directed verdict at the close of Mr. Fitzhugh's case-in-chief, Little Rock Newspapers argued, among other things, that Mr. Fitzhugh had offered no evidence to show that the article published by the *Arkansas Democrat-Gazette* actually injured his reputation. Little Rock Newspapers was correct in this assertion, and its motion for directed verdict should have been granted.

With respect to the damages question in this case, the majority perceives the issues to be "what particular type of proof is sufficient to sustain a jury's verdict in favor of a plaintiff in a defamation action" and "how much proof of actual injury to reputation is sufficient to render the issue one for the jury to resolve."

Since 1983, the "type" of proof of damages that we have required in a defamation case such as this one is proof of actual injury to reputation. *Little Rock Newspapers, Inc. v. Dodrill,* 281

Ark. 25, 660 S.W.2d 933 (1983). *See generally* HOWARD W. BRILL, ARKANSAS LAW OF DAMAGES § 33-9, at p. 577 (3d ed. 1996) (stating that, in a case against a media defendant, "damages to reputation are not presumed. In the absence of a showing of actual malice, no damages may be recovered without proof of some actual injury to the reputation. Recovery for the mere humiliation, mental suffering or sorrow of the plaintiff, standing alone without injury to reputation, is not permitted")(footnotes omitted); David A. Anderson, *Reputation, Compensation, and Proof,* 25 WM. & MARY L. REV. 747, 758 (1984)("If a plaintiff suffers no demonstrable harm to his reputation, however, he should have no cause of action for defamation.").

In order to create a jury question on the issue, a plaintiff simply must introduce substantial evidence, or evidence "of sufficient force and character to induce the mind of the factfinder past speculation and conjecture," *Allred v. Demuth,* 319 Ark. 62, 64, 890 S.W.2d 578, 580 (1994), that the publication of the defamatory statement has in fact injured his reputation. In *Hogue v. Ameron, Inc.,* 286 Ark. 481, 695 S.W.2d 373 (1985), which did not involve a media defendant, we said the issue of reputational injury should have gone to the jury where the plaintiff had testified that his reputation had been harmed as a result of the publication of the allegedly defamatory statement and another witness had testified, albeit "rather vaguely," that the plaintiff's reputation had "changed for the worse" following publication of the statement. *Id.* at 483, 695 S.W.2d at 374. Citing the *Hogue* case, a federal district court and a commentator have suggested that the burden of proving reputational injury in this jurisdiction is not difficult. *See Mitchell v. Globe Intern. Pub., Inc.,* 773 F. Supp. 1235, 1237 (W.D. Ark. 1991)("The showing of actual damage to reputation required by other Arkansas cases has been slight."); BRILL, *supra* ("The amount of evidence of damage to reputation necessary to take the case to the jury appears to be easily satisfied."). Regardless of how one characterizes the *quantum* of proof necessary to sustain a verdict, the proof, at least in this type of defamation case, must establish, as a threshold matter, that the statement actually injured the plaintiff's reputation.

Our cases since *Little Rock Newspapers, Inc. v. Dodrill, supra,* have not prescribed a clear method by which a plaintiff may prove that his reputation has been injured by the publication of a defamatory statement. Able commentators have made several good suggestions, however. A student commentator has noted that a plaintiff's interest in his reputation

> is a "relational interest" that involves the opinions which others in the community may have of the plaintiff. The most important relations that people have are family relations, social relations, trade relations, and professional relations. The plaintiff's task is to prove the defamatory statements have been communicated to others *who reacted to the detriment of these relations.*

Steve Garner, *Little Rock Newspapers, Inc. v. Dodrill: Proving Damage to Reputation in a Libel Action,* 38 ARK. L. REV. 889, 908 (1985)(emphasis added). *See also* PROSSER & KEETON ON THE LAW OF TORTS § 111, at p. 771 (5th ed. 1984)(stating "defamation is an invasion of the interest in reputation and good name. This is a 'relational' interest, since it involves the opinion which others in the community may have, or tend to have, of the plaintiff.").

The plaintiff's "evidence must focus upon proving damages to relational interests" and demonstrate "the impact the statements had upon others to the detriment of the plaintiff's relationships with them." Garner, *supra,* at 911. Toward this end, the plaintiff may introduce testimony bearing on his "standing and reputation prior to the libel" and the "effect the libel had on his family, business, and social relations." *Id.* at 908. Testimony showing any "specific instances of social ostracism and rebuke," as well as testimony "concerning the impression and effect which the libel had on the minds of other persons," would also be relevant. *Id.* at 909. *See also* BRILL, *supra* ("Specific instances of rebuke, humiliation and insults may aid in demonstrating post-defamation reputation."). Other approaches to proving reputational injury are discussed in David A. Anderson, *Reputation, Compensation, and Proof,* 25 WM. & MARY L. REV. 747, 764-78 (1984); RODNEY A. SMOLLA, LAW OF DEFAMATION § 9.06[6], at pp. 9-15 to 9-16 (1993); and 2 DAN B. DOBBS, LAW OF REMEDIES § 7.2(5), at p. 274 (1993).

Based on the evidence introduced by Mr. Fitzhugh, reasonable men and women could not have concluded that the article published in the *Arkansas Democrat-Gazette* caused actual harm to Mr. Fitzhugh's reputation. Mr. Fitzhugh's case for damages rested on his own testimony as well as that of his wife and his friends and acquaintances who had read, or heard about, the article. Mr. Fitzhugh maintained at trial that the publication of the article had damaged his reputation "because people have told me it has an effect." Mr. Fitzhugh testified that, following the publication of the article, some 25 to 30 friends and acquaintances, family members, or colleagues in the legal profession had either telephoned him or approached him at various times and places to inquire or comment about the article or the status of his lawsuit against the newspaper.

According to Mr. Fitzhugh, these individuals made a variety of comments. Some indicated to Mr. Fitzhugh that they had seen the article and had discussed it with others. Some asked whether there would be a retraction or whether a lawsuit would be filed. Others, according to Mr. Fitzhugh's very general testimony, just "made comments" about the case or "inquired" about it. Mr. Fitzhugh mentioned certain individuals who had told him that they were glad he was not involved in the Whitewater investigation; that they were concerned for him; or that they did not believe the story was about him. One individual wondered if the article had used Mr. Fitzhugh's middle name, and he called Mr. Fitzhugh to ask what his middle name was. Some individuals "tried to kid" Mr. Fitzhugh about the article.

The majority suggests that Mr. Fitzhugh's testimony helped establish that his reputation was injured as a result of the publication of the article. The majority's analysis, however, overlooks the remainder of Mr. Fitzhugh's testimony. On cross-examination, Mr. Fitzhugh conceded that he did not think that the individuals he had mentioned believed that he was being prosecuted for a Whitewater-related crime. Mr. Fitzhugh conceded that none of these individuals ever shunned or avoided him. He testified that he had remained friends with his "close friends" and that he knew of no one who had "quit seeing [him] because of this article." Mr. Fitzhugh said that he knew of no lawyers who had quit speak-

ing to him, or referring clients to him, on account of the article. Furthermore, Mr. Fitzhugh never claimed that publication of the article had deleteriously affected his law practice or income or had hindered his ability to maintain or expand his client base. He specifically testified that he was not seeking special damages of this kind, and there was no evidence of such damages introduced at trial.

Although Mr. Fitzhugh testified that he was upset and embarrassed by the article and that he had experienced difficulty sleeping, such evidence of mental anguish, in the absence of proof of an actual reputational injury, cannot support an award of damages in a defamation action. *Little Rock Newspapers, Inc. v. Dodrill, supra.* Absolutely nothing in Mr. Fitzhugh's testimony supports the conclusion that his reputation was harmed as a result of the article in question. Mr. Fitzhugh cited no relationships that were actually injured on account of the article, and he could not name one person who held him in lower esteem after having read the story. Mr. Fitzhugh could not recall one instance of rebuke, "shunning," or social ostracism that occurred as the result of the article's publication. Although Mr. Fitzhugh had testified that "people," whom he never identified, had told him that publication of the story would have the "effect" of damaging his reputation, he did not point to any conversation in which he was told that the article had *in fact* injured his reputation. Nothing that Mr. Fitzhugh said suggests that *anyone* actually held him in lower esteem after having read the article in the *Arkansas Democrat-Gazette.* The relationships that Mr. Fitzhugh did discuss were clearly unaffected by publication of the article.

Likewise, the testimony of the other witnesses called by Mr. Fitzhugh did nothing to establish that the publication of the article caused an actual injury to Mr. Fitzhugh's reputation. Mr. Fitzhugh's wife testified that Mr. Fitzhugh was upset and had lost sleep over the article and that he was worried about his reputation. Ms. Fitzhugh testified she, too, had "worried about the people we didn't know that thought it was him." This testimony, however, showed only the emotional harm that the Fitzhughs suffered as a result of the article's publication and did not show any reputational injury. Ms. Fitzhugh testified that people would inquire and ask

her and her husband "what was going on." However, Ms. Fitzhugh conceded that none of Mr. Fitzhugh's relationships had suffered because of the publication. On cross-examination, she testified, as abstracted, that "[n]one of his friends avoided him to my knowledge, and none of our couple friends avoided us. We were never asked to leave the country club as a result of this article." Like Mr. Fitzhugh, Ms. Fitzhugh referred to no instances of social ostracism that occurred as a result of the article's publication. Her testimony did nothing to show any injury to Mr. Fitzhugh's reputation.

Testimony was also given by Jeannie Kay Luttrell, Cole Goodman, Gilbert Travis, Philip Merry, Howard Pearson, Ben Barry, and Asa Hutchinson. Ms. Luttrell and Messrs. Goodman and Travis testified that they initially believed the article was about Mr. Fitzhugh. Ms. Luttrell testified that she was under this impression from June until some point in the fall when she learned the truth from a friend. Mr. Goodman testified that he initially believed Mr. Fitzhugh had been indicted in the Whitewater case and was "perturbed" with him for a few moments until he immediately reread the article and realized it was about someone else. Mr. Travis stated he initially believed Mr. Fitzhugh was "in trouble" until he phoned Mr. Fitzhugh to ask what was going on.

Although these three witnesses initially believed the story and concluded that Mr. Fitzhugh had in fact been indicted for fraud, they did not testify that they, or anyone else, held Mr. Fitzhugh in lower esteem or thought less of him as a result of the article's publication. As Ms. Luttrell testified, "I was friends with Mr. Fitzhugh before this occurred and am still." In no manner did she indicate that her opinion of Mr. Fitzhugh wavered during the time that she believed he was a criminal defendant in the Whitewater case. She admitted she never called the Fitzhughs during this time but explained that she had not wanted to embarrass them with questions. Likewise, Mr. Coleman testified that the article had not damaged his relationship with Mr. Fitzhugh, and Mr. Travis testified that the article would not prevent him from going to Mr. Fitzhugh for legal advice if he needed to change attorneys.

The testimony of the remaining witnesses also failed to establish any injury to Mr. Fitzhugh's reputation. Mr. Merry testified that he had not even read the article in question, and he stated that Mr. Fitzhugh has "always" had a good reputation in the community. Mr. Pearson testified that he understood the article "as a whole" to suggest that Mr. Fitzhugh had "done something wrong," but he indicated that he had not believed the article. Mr. Barry testified that he knew the article was not about Mr. Fitzhugh and that the article had not impaired his friendship with Mr. Fitzhugh. Finally, Mr. Hutchinson testified that he, too, had not believed the article was about Mr. Fitzhugh and that the article had not affected his friendship with Mr. Fitzhugh or prevented him from referring clients to Mr. Fitzhugh.

These witnesses specifically testified that publication of the article in question had no impact on their own relationships with Mr. Fitzhugh or their opinions of him. Not one of them identified anyone else who held Mr. Fitzhugh in low esteem as a result of the article's publication, and not one of them referred to an actual present or potential relationship between Mr. Fitzhugh and any other person that suffered on account of the article's publication. Moreover, none of them mentioned any instances of rebuke or social ostracism encountered by Mr. Fitzhugh as a result of the article's publication.

Ms. Luttrell and Mr. Goodman said that they *"would think"* that the article *"would harm"* Mr. Fitzhugh's reputation or *"would have* a damaging effect" on it and that the article "might" cause potential clients to seek legal assistance elsewhere. Mr. Travis added that some "people" who saw the article and were seeking to hire counsel *"might* have second thoughts" about hiring Mr. Fitzhugh. Mr. Hutchinson similarly predicted that an article like the one in question "would harm anyone's reputation." These witnesses did not testify, however, that Mr. Fitzhugh's reputation in particular had in fact been damaged by the article's publication or that the article had in fact turned potential clients away. Dr. Goodman conceded on cross-examination that he did not know whether Mr. Fitzhugh had lost clients or potential clients on account of the article, and Mr. Hutchinson conceded that he had no personal knowledge of Mr Fitzhugh's law practice. These wit-

nesses did no more than testify that they *presumed* an injury to Mr. Fitzhugh's reputation had resulted from publication of the article. This was clearly insufficient under our holding in the *Dodrill* case.

The last bit of evidence cited by the majority is the testimony of Robert Lutgen, a managing editor at the *Arkansas Democrat-Gazette.* The majority endorses Mr. Fitzhugh's position on appeal that Mr. Lutgen's apparent "admission" that publication of the article caused "minor damage" to Mr. Fitzhugh suffices as proof of injury to his reputation. The majority rejects Little Rock Newspapers' argument that Mr. Lutgen was not talking about Mr. Fitzhugh's reputation when he made that statement.

After conceding that a newspaper has the power to damage a person's reputation by printing false information about him or her, Mr. Lutgen moved on to discuss other issues in the case. Counsel for Mr. Fitzhugh later asked him whether the newspaper believed Mr. Fitzhugh had suffered any "damage" as a result of the article's publication. Mr. Lutgen answered that the publication had not caused "significant damage" because the newspaper had printed a retraction. Mr. Lutgen conceded that the article had caused "some damage" and that "the question is how much," but he never indicated whether he was referring to damage to Mr. Fitzhugh's reputation or some other type of damage such as emotional distress. Counsel for Mr. Fitzhugh asked Mr. Lutgen to state "how much damage you believe this caused to Mike Fitzhugh," and Mr. Lutgen answered, "We understand it was embarrassing to him. We understand that it was a mistake er—I don't suspect there is any way of actually measuring the damage." Counsel then suggested that Mr. Lutgen could not "put a dollar figure on your reputation," and Mr. Lutgen answered, "right." Mr. Lutgen later discussed his estimate of the number of readers who had recognized Mr. Fitzhugh and stated that it had been difficult to "assess the overall damage." Counsel asked Mr. Lutgen to describe once more the amount of "damage" that he believed Mr. Fitzhugh had suffered, and Mr. Lutgen responded that publication of the article had caused "minor damage."

The record does not clearly establish, one way or the other, whether Mr. Lutgen made the statement that publication of the

article had caused "minor damage" in reference to damage to reputation. Mr. Lutgen did not specifically indicate that he was referring to any reputational injury, and his statement that the article had been "embarrassing" to Mr. Fitzhugh suggests he was referring only to damages for mental anguish. Other portions of the testimony, however, particularly Mr. Fitzhugh's estimate of the number of readers who might have recognized Mr. Fitzhugh, could suggest that Mr. Lutgen was assessing the impact of the article on Mr. Fitzhugh's reputation.

Given the obvious ambiguity in the testimony, we should not assume that Mr. Lutgen was necessarily giving an opinion as to the effect of the article on Mr. Fitzhugh's reputation. However, whether or not Mr. Lutgen was in fact stating a belief that the article's publication had injured Mr. Fitzhugh's reputation, his testimony was not sufficient to establish such an injury. The statement in question was no more than a guess that Mr. Fitzhugh's reputation had suffered as a result of the article's publication. Like the other witnesses, Mr. Lutgen pointed to no relationship that was actually harmed by the publication of the story, and he did not mention any person who in fact held Mr. Fitzhugh in lower esteem after having read the story.

In sum, none of the witnesses who testified on Mr. Fitzhugh's behalf established that the *Arkansas Democrat-Gazette*'s publication of the article in question had in fact (1) negatively affected their own relationships with, or opinions of, Mr. Fitzhugh; (2) negatively affected any other person's relationship with, or opinion of, Mr. Fitzhugh; (3) caused Mr. Fitzhugh to experience any type of rebuke or social ostracism from any person; or (4) caused Mr. Fitzhugh to suffer any "special damages," such as loss of income to his law practice. Little Rock Newspapers' motion for directed verdict therefore should have been granted. *See Richie v. Paramount Pictures Corp.*, 544 N.W.2d 21, 26-27 (Minn. 1996) (affirming summary judgment in defendants' favor where plaintiff could "point to no specific facts demonstrating that her reputation has been affected" and where proof showed, among other things, that no one thought less of plaintiffs on account of defamatory broadcast and that there was no "change in behavior" in those plaintiff regularly encountered in his employment).

At most, the evidence introduced by Mr. Fitzhugh showed that some witnesses who read the article thought it had the tendency or propensity to injure Mr. Fitzhugh's reputation or that some witnesses believed that Mr. Fitzhugh had been implicated in the federal Whitewater investigation. However, as our holding in the *Dodrill* case makes clear, the proof of damages must show an actual injury to reputation, not merely that the publication of the article "could have" harmed or "had the tendency to harm" the plaintiff's reputation. *See also Reveley v. Berg Publications, Inc.*, 601 F. Supp. 44, 46 (W.D. Tex. 1984)(". . . the court concludes that in the wake of *Gertz* even if evidence was heard that the article *tended* to injure plaintiff, that a mere tendency to injure without proof of actual injury cannot support a finding of defamation . . . .").

Moreover, none of our defamation cases, and no defamation case from any other state that has adopted, as we did in the *Dodrill* case, a requirement of reputational injury, *see, e.g., Richie v. Paramount Pictures Corp.*, 544 N.W.2d 21 (Minn. 1996); *Gobin v. Globe Publishing Co.*, 649 P.2d 1239 (Kan. 1982); *France v. St. Clare's Hospital and Health Center*, 82 A.D.2d 1, 441 N.Y.S.2d 79 (A.D. 1st Dept. 1981); *see generally* Annotation, *Proof of Injury to Reputation as Prerequisite to Recovery of Damages in Defamation Action—Post-Gertz Cases*, 36 A.L.R.4th 807, 811-13 (1985 & Supp. 1997), has ever *held* that proof of reputational injury may be established by testimony showing that, for a brief amount of time, a witness believed that the publication was true. Other than the barest *obiter dicta* from *Salomone v. MacMillan Pub. Co., Inc.*, 77 A.D.2d 501, 429 N.Y.S.2d 441 (A.D. 1st Dept. 1980), nothing is cited by the majority to support its novel position that a reputational injury occurs whenever an individual, if only for a fleeting moment, believes the truth of a defamatory publication.

The majority essentially *presumes* that Mr. Fitzhugh's relationships with Ms. Luttrell and Messrs. Goodman and Travis were harmed by the article's publication simply because they said they initially believed Mr. Fitzhugh had been indicted in the Whitewater case. Not only does this position lack the support of a holding of any defamation case, but it also blatantly ignores the testimony of these very witnesses who plainly stated that their high opinions

of Mr. Fitzhugh remained unchanged despite their initial belief in the truth of the publication. These witnesses' testimony directly refutes the majority's assertion that "[t]he fact that the witnesses believed that Appellee was charged with a crime involving the Whitewater scandal demonstrates that they thought less of Appellee as a result of the article."

More troubling, however, is the majority's statement that "persons who were not personally acquainted with Appellee would not have been capable of verifying the truth nor would they have been known to Appellee so that he could secure their testimony for trial." The suggestion seems to be that there *might have been* individuals who read the story and, as they did not know Mr. Fitzhugh and were therefore unable to inquire with him about the truth of the article, *must have* held him in lower esteem as a result of having read the article. The mere possibility that readers of the *Arkansas Democrat-Gazette* think less of Mr. Fitzhugh on account of the article, the majority seems to say, is additional proof that his reputation was actually injured by the publication of the article.

The majority pays lip service to the rule from *Gertz v. Robert Welch, Inc.,* 418 U.S. 323 (1974), that damages may not be presumed in cases against media defendants absent evidence of malice, and yet it sustains the award of damages in this case based in part on a hunch that readers who did not testify at trial *might* have seen the article and *might* have thought less of Mr. Fitzhugh as a result. The majority presumes damages in direct contravention of the *Gertz* case and our holding in the *Dodrill* case and bases that presumption upon unknown readers' *presumed* reactions to the article.

I respectfully dissent.

ARNOLD, C.J., and THORNTON, J., join this dissent.